962 So.2d 1203 (2007)
STATE of Louisiana, Appellee
v.
Avionest Leonest FULLER, Appellant.
No. 42,211-KA.
Court of Appeal of Louisiana, Second Circuit.
August 15, 2007.
*1204 English & Associates, by Larry English, Shreveport, for Appellant.
Paul J. Carmouche, District Attorney, Tommy J. Johnson, Edward M. Brossette, Assistant District Attorneys, for Appellee.
Before BROWN, STEWART and DREW, JJ.
STEWART, J.
The defendant, Avionest Leonest Fuller, was convicted of manslaughter, a violation of La. R.S. 14:31. He was adjudicated a second felony offender and thereafter sentenced to twenty years at hard labor without the benefit of probation or suspension of sentence. The defendant now appeals. For the reasons that follow, we affirm his conviction and sentence.

FACTS
Avionest Fuller, and the victim, Deandre Welch, were at one time friends. The victim's wife recounted that the defendant had been a guest in her home in the past. At some point, the relationship soured as Welch became upset with the defendant for reasons not entirely clear in the record. Some related the discord to a dispute concerning drugs while others related the matter to a dispute involving a woman. Although the exact matter of dispute was *1205 unknown, Fuller was convinced that Welch was intent on killing him.
The bad blood between the men continued. At some time prior to the shooting, Welch made known his intentions to "deal with" Fuller for "snitching." After this declaration, Welch and his wife pulled guns on Fuller and threatened to shoot him. The evening before the fatal shooting, witnesses and Fuller alleged that Welch again pulled a gun and threatened to shoot him, but was deterred from this action.
The next day, on January 14, 2004, Fuller saw Welch walking a dog in the neighborhood where the defendant's mother lived. The victim's mother-in-law was also a resident of the area. After seeing Welch in the neighborhood, Fuller, armed with a AK-47 assault style weapon, drove to Welch's mother-in-law's home and confronted him about the previous threats. The men talked briefly before Fuller opened fire upon Welch. As Welch attempted to flee, Fuller chased him while firing a barrage of bullets. Welch eventually fell and Fuller stood over him shooting into his body. Twenty-two shell casings were recovered from the scene, and Welch had at least 14 gunshot wounds, at least one of which the autopsy revealed was inflicted to the back of his head.
Fuller was arrested on the day of the shooting, and charged with second degree murder. The defendant elected to be tried by judge and was found guilty of manslaughter. The trial judge thereafter sentenced the defendant to 20 years at hard labor.

DISCUSSION
Sufficiency of the Evidence
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion *1206 only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
Manslaughter is a "homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. R.S. 14:31 A(1); State v. Quiambao, 36,587 (La.App. 2d Cir.12/11/02), 833 So.2d 1103; State v. Hudson, 33,357 (La.App. 2d Cir.5/10/00), 760 So.2d 591.
A defendant is required to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be appropriate. State v. Robinson, 32,794 (La.App. 2d Cir.03/01/00), 754 So.2d 311, writ denied, 00-0989 (La.03/23/01), 787 So.2d 1008.
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986). A defendant who shows by a preponderance of the evidence that these mitigatory factors are present is entitled to the verdict of manslaughter. State v. Tompkins, 403 So.2d 644 (La. 1981); State v. Lombard, supra; State v. Jackson, 34,076 (La.App. 2d Cir.12/6/00), 774 So.2d 1046. The defendant is not obligated to establish the factors affirmatively; instead, the jury may infer them from the overall evidence presented. State v. Jackson, supra.
Self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, 25,940 (La.App. 2d Cir.3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1st Cir.1992), rev. denied, 92-2351 (La.5/12/95), 654 So.2d 346.
When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La.1985).
La. R.S. 14:20 provides, in pertinent part:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
When self-defense is raised as an issue by a defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Garner, 39,731 (La.App. 2d Cir.9/08/05), 913 So.2d 874, writ denied, 2005-2567 (La.5/26/06), 930 So.2d 19; State v. Cheatham, 38,413 *1207 (La.App. 2d Cir.6/23/04), 877 So.2d 164, writ denied, 2004-2224 (La.6/24/05), 904 So.2d 717. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. State v. Spivey, 38,243 (La. App. 2d Cir.5/12/04), 874 So.2d 352; State v. Hardeman, 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982); State v. Spivey, supra.
At the beginning of the trial, the state and defendant entered a joint stipulation as to the testimony of Dr. Elizabeth Miller, the coroner who performed the autopsy of the victim. The parties stipulated that the victim died of multiple gunshot wounds and that 14 projectiles or pieces of projectiles were recovered from the victim's body. The autopsy report was entered into evidence as a part of the stipulation.
The state's first witness was Sergeant Carolyn Deal. On the morning of the shooting, Sergeant Deal was working at Sunset Acres Elementary school approximately one block from the shooting scene. As she was leaving the school going to her vehicle, Sergeant Deal heard a "succession of gunshots" that appeared to be close to her location. Sergeant Deal testified the gunshots were extremely loud, and happened in rapid succession. Sergeant Deal opined that the shots all originated from the same weapon. Based on the "loudness" of the shots, Sergeant Deal did not believe the weapon being fired was a small caliber weapon or pistol.
After hearing the shots, Sergeant Deal radioed police headquarters of the shooting and ran to the location at West Canal and Grassmere streets. As she arrived on the scene approximately two minutes after hearing the shots, Sergeant Deal noticed a lot of people standing around screaming and pointing toward a house on the corner indicating where the victim was. Sergeant Deal testified that she approached the victim and attempted to determine if he had a pulse, which he did not. In an attempt to secure the scene, Sergeant Deal remained near the victim's body until other assistance arrived. The witness indicated she did not see anyone remove anything from the victim or the immediate area.
Jimmy D. Woodall testified he lived at 2905 Grassmere which is next door to where the shooting occurred. At approximately 8:30 a.m., Mr. Woodall, who had been in bed, heard gunshots and went to his bedroom window. As he looked out of the window, Mr. Woodall was able to see a shooter firing a rifle in a "spraying motion." Based on his familiarity with weapons, Mr. Woodall believed the weapon to be either an AK-47 or SKS-47. According to Mr. Woodall, there was no one else firing a weapon at the time of the shooting, and he believed another shooter would have been visible from his vantage point in his bedroom window. Mr. Woodall testified he only heard the sounds of one weapon firing because "I heard no deviation whatsoever in the sounds of the pops."
After the shooting stopped and he heard a vehicle drive away, Mr. Woodall went outside to his neighbor's yard to see if he could help. He went to the victim's body and found out he could not do anything for him.
Mrs. Beverly Woodall testified she was also at home, next door to the shooting, when she heard someone outside of her home "fussing or yelling" then she heard *1208 shots being fired. Mrs. Woodall went to her front door and looked out to see a guy with a gun. Mrs. Woodall closed the door and then called 9-1-1. Mrs. Woodall testified she was not very familiar with guns, but she did recall that the shooter was holding a "medium gun" near his waist. Mrs. Woodall indicated she only saw one shooter and heard "quite a few shots" that sounded the same. After the shooting, Mrs. Woodall remained inside.
Corporal T.W. Adgate of the Shreveport Police Department (SPD) testified he was responsible for transporting the defendant after he was apprehended. According to Corporal Adgate, when he arrived at the Diamond Shamrock gas station on Bert Kouns and Baird, the defendant was placed in the back of his unit. While the defendant was in Corporal Adgate's vehicle, he began a spontaneous statement which was captured on the video recording equipment of the police vehicle. The videotape was admitted into evidence and played for the court. Corporal Adgate testified the video was an accurate representation of the statements the defendant made during transport. Corporal Adgate testified he was unaware of any prior reports the defendant may have made regarding threats against his life. During his statement, the defendant did not indicate that the person he shot was armed.
In the statement to Corporal Adgate, the defendant related that he was fearful that the victim was planning to kill him and that the night prior to the shooting, the victim had threatened to shoot the defendant as he sat in his truck near Long and Theo streets. The defendant stated that the victim "cleared the block" by shouting for everyone to leave the area because he was going to kill the victim. When this did not happen, the defendant left the area. Early the next morning, the defendant saw the victim walking a dog near the defendant's mother's home, and the defendant stated he feared the victim was planning to shoot into his mother's home or ambush him as he drove in the area. The defendant stated he went to confront the victim, and began shooting after the victim made an attempt to shoot him.
Detective Chris Ray, an investigator with the SPD, testified he was involved in the investigation of the shooting. Det. Ray was on the scene when the defendant was arrested. The defendant was advised of his Miranda rights when placed into custody, and again prior to being interviewed by the detective. The defendant made two statements one of which was recorded the day after the incident. According to Det. Ray, the defendant was initially interviewed without any recording being made. Prior to taking the recorded statement, the defendant indicated he was tired and wanted to sleep, but the officers were able to get the statement prior to the defendant being booked.
During the unrecorded statement, Fuller reported that the night before the shooting, Welch threatened him, and on the morning of the shooting, he saw Welch walking a dog near his (defendant's) mother's home. Fuller indicated that he feared Welch was planning to shoot up his mother's house, and he didn't want to be the first homicide victim of 2004. When the officers indicated the statement needed to be taped, the defendant indicated he was tired and needed to rest.
Later, Fuller gave a recorded statement that was introduced into evidence and played for the court. In the audio recording, Fuller admitted arming himself with an AK-47 or "chopper." He also admitted to killing Welch. In Fuller's statement, he admits he approached the victim prior to the shooting. He indicated he was fearful of Welch and his wife, but he allowed Welch's wife to move away from the scene *1209 before he began shooting at him. During the interview, the defendant also indicated he had been threatened by Welch. Det. Ray went to the location where the incident the night before the shooting took place, but was unable to find any cooperating witnesses. Additionally, as a part of his investigation, Det. Ray searched police records and was unable to find any reports filed by the defendant regarding threats made by the victim.
Det. Ray had an opportunity to visit the crime scene after the shooting. Det. Ray testified when he arrived on the scene, there were patrol cars on the scene, and the victim's body had been covered by a fire department sheet. Once the sheet was removed, Det. Ray was able to see the victim's body, and he noted that the victim was face down and injuries were visible to his back as well as his head and neck.
On cross-examination, Det. Ray testified the defendant maintained he shot the victim in self-defense and that he saw the victim with a gun. He also mentioned that Fuller indicated he went to talk to Welch to determine why he was trying to kill him. Det. Ray also testified he learned just prior to the trial that Harvis White provided the D.A.'s office with a letter indicating that a gun had been taken from the crime scene. Det. Ray had not investigated this claim prior to the trial.
Corporal David Walls of the SPD crime scene investigation unit processed the crime scene for evidence. On the second day of the trial, the state and the defendant entered a stipulation regarding the crime lab report. According to the stipulation, the casings recovered and examined were consistent with being fired from the same weapon.
Sergeant Mark Davis of the SPD testified he was involved in the apprehension of the defendant. Sergeant Davis was one of the first officers to come in contact with Fuller when he was arrested. After taking Fuller into custody, Sergeant Davis recognized him from his previous encounters. Sergeant Davis testified the defendant cooperated with him on another investigation. According to Sergeant Davis, Fuller had his contact information, but that he had not reported any threats being made by Welch.
Sergeant Davis testified that Fuller had been providing information regarding individuals who may have been dealing narcotics; however, he did not recall him providing Welch's name as one of the possible drug dealers. Sergeant Davis later elaborated on the defendant's cooperation with the narcotics investigation. He stated that Fuller apparently did not provide much useful information, and he was to secure an arrest warrant for Fuller prior to the murder investigation.
The victim's wife, Lunshundia K. Welch, testified on behalf of the state. At the time of the trial, the witness was incarcerated. According to Mrs. Welch, she and the victim were waiting outside her mother's home just prior to the shooting. As they waited outside, Fuller pulled up in his truck, and began talking. He then got out of the vehicle, ran up the driveway and started shooting an AK-47. She further testified that when Fuller pulled up, the victim told her to run, which she did. As she ran, Mrs. Welch saw Fuller chasing her husband, so she hollered telling him not to shoot. Mrs. Welch heard the defendant say "Now what's up punk-a* * ni* * *r" and "This is going to be your [sic] last time you breathe." Fuller chased the victim while shooting at him in the driveway. Mrs. Welch indicated the defendant was shooting the gun during the entirety of the chase, and fired approximately 14 or 15 shots.
According to Mrs. Welch, after the victim fell between the two cars parked in the *1210 driveway, the defendant stood over the victim and fired more shots at him. While the victim did not have a weapon at the time of the shooting, Mrs. Welch indicated that she had one that day. After her husband was shot, she ran into her mother's house and asked her to call the police. After doing so, Mrs. Welch went back outside to her husband and picked up his head and found him dead.
Mrs. Welch indicated she knew Fuller prior to the shooting as he had been introduced to her by her husband. Mrs. Welch acknowledged that Fuller and the victim argued prior to the incident, but stated, "I seen them argue, and every time when I asked him what was going on it was like he wouldn't put me in it, he say it's between them. You know, other than that, you know, Avionest, they was cool." Later, Mrs. Welch testified that Fuller and the victim had an argument approximately one month prior to the shooting, which ended when she, fearing for her husband's safety, pulled an AK-47 on the defendant.
During cross-examination, Mrs. Welch denied any knowledge of the victim being angry with the defendant because the defendant had furnished the victim's name to the narcotics agents. Mrs. Welch also denied that her husband sold narcotics, but she admitted that she did so. Regarding the argument which ended when she pulled the weapon on the defendant, Mrs. Welch testified she did not know why the argument started or whether it was drug related. Mrs. Welch did not see the defendant with a weapon on that day, and denied asking her husband if she should shoot the defendant, saying "No, because I could have shot all of them even if he didn't say nothing."
When questioned about the night before the shooting, Mrs. Welch acknowledged she and her husband were in the area of Theo and Long Streets when they saw the defendant sitting in his truck. Mrs. Welch testified when she saw Fuller she told her husband it was time to leave, but there was never an argument between the men on that night. Mrs. Welch stated Fuller remained in his truck and Welch did not approach the truck.
When recalling the day of the shooting, Mrs. Welch testified that she went to her husband's body before any emergency personnel arrived. After finding him dead, Mrs. Welch went back into her mother's house. She denied taking any drugs or a gun off of her husband's body, and she denied later giving a weapon to Harvis White. Mrs. Welch stated that Mr. White stole the weapon from her home and that the gun belonged to her and not her husband. In an effort to retrieve the stolen gun, Mrs. Welch stated she called Mr. White's girlfriend telling him to the return the items or she would take care of them.
The defense called Mr. Harvis Ray White as its first witness. Mr. White testified he grew up with the defendant and had been best friends with the victim since 1995. Mr. White testified he met the victim through the Rolling 60's gang that the victim brought to the area. According to Mr. White, the victim was known in the community as a killer.
Mr. White testified he knew of problems between the victim and the defendant which stemmed back several years relating to a female and possibly drugs. As a result of the animosity, the victim had threatened to kill the defendant on at least two occasions that the witness was aware of. In one instance, the victim and his wife pulled guns on the defendant when the witness was present, and the other instance occurred the day before the victim was killed. The victim apparently threatened the defendant with a "semi-rifle" telling him he would kill him.
Mr. White stated that Welch drove into the area where Fuller was sitting in *1211 his parked truck. He said that Welch threatened Fuller with the gun saying he was going to kill him if he kept playing games. Welch's wife was also armed as she waited in the vehicle. Afterwards, both Welch and Fuller left the area. Mr. White followed closely behind Welch "so, we did not want him to do nothing stupid, you know what I'm saying." When Mr. White first found Fuller he told him not do anything in retaliation. After Fuller acknowledged that he was all right, Mr. White found Welch who "caught attitude" because Mr. White was checking on the situation and he felt that Mr. White was siding with Fuller. Mr. White eventually returned to the Theo and Long area. Later that night, Mr. White went to Mrs. Welch's mother's house where he spent the night.
The next morning, Mr. White was sitting in the house when he heard 20-25 gunshots. Mr. White stated he heard what sounded like two people shooting at each other from different guns. After the shooting, the victim's wife gave Mr. White a .357 magnum with three spent cartridges and told Mr. White to go home as she was getting ready to call the police. Mr. White complied with Mrs. Welch's request. Mr. White testified he did not know what was going on or who was involved, but he did know that Welch was outside and had just finished walking the dog. Mr. White also stated that the victim owned a variety of weapons and was known to carry a weapon most of the time.
Later on the evening of the shooting, Mrs. Welch called Mr. White over to her house at which time she offered him $5000 and a shotgun to kill the defendant or "whoever come to the door." Mr. White took both the money and the shotgun, but later decided not to go through with the planned hit. After Mrs. Welch found out Mr. White reneged on the deal, she threatened to kill him. Mr. White stated he sold both guns to a friend of his in the Illinois Project.
Mr. White was later arrested "about a theft charge [after] she claim I stole a watch out of her house." Prior to being arrested, Mr. White stated the he was chased by "people from California" who threatened that he should return the guns and the money or things would get serious. Fearing for his safety, White turned himself in to police on the pending theft charges. While incarcerated in protective custody, Mr. White wrote a letter to the trial judge indicating that he had taken a weapon from the scene.
Lashunda Dukes, an ex-girlfriend of Mr. White's, testified Welch and others were at her home one day when he inquired about Fuller. According to Ms. Dukes, Welch stated he was going to get Fuller when he saw him because he heard that Fuller had been doing a lot of snitching. After Welch was killed, Mrs. Welch contacted Ms. Dukes and told her Mr. White stole a watch from her. Ms. Dukes testified that Mrs. Welch threatened to kill her and her children if Mr. White did not return her watch. Ms. Dukes reported this information to the guards at her apartment. Later, Ms. Dukes saw two Suburbans parked outside of her home. The guards told Ms. Dukes they spoke with the individuals in the vehicles and informed them that Mr. White was not at the residence and that Ms. Dukes, who was uninvolved in the matter, had small children in her home.
Erin Robinson testified to being at Lashunda's house, and hearing Welch say he was going "to deal with" Fuller once he saw him, because the defendant had been doing a lot of "snitching." According to Ms. Robinson, the street term "deal with him" means to kill him. There was no time frame given as to when this conversation occurred.
*1212 Mr. Frederick Greer testified he was friends with both the victim and the defendant. According to Mr. Greer, the victim was known as "a high-powered individual from the streets" and known for pushing people around. Mr. Greer stated that Welch and his wife sold drugs and that Welch had a weapon each time Mr. Greer saw him.
On one occasion, three to four weeks prior to the shooting, Mr. Greer and a friend, San Juan, had Fuller take them to Welch's home to purchase marijuana. Fuller went to Welch's door, and upon seeing Fuller, Welch began cursing the defendant and asked Mr. Greer why Fuller was at the home. Mr. Greer testified that the victim pulled an AK-47 from behind his leg and pointed it at Fuller. Welch then accused Fuller of talking behind his back and possibly having some involvement in an attempted burglary of the victim's home. Mr. Greer persuaded Welch to put the weapon away and talk about the situation.
After Welch put his weapon away, his wife came out of the house pointing a sawed-off shotgun at the group. Mrs. Welch inquired of her husband whom he was having a problem with and was told it was Fuller. Mrs. Welch then pointed the weapon at Fuller. Mr. Greer stated he again encouraged Welch to put away the weapons and settle the matter at a later date. Welch then stated he would allow the group to leave. Sometime later, Mr. Greer saw Welch at a store and they discussed the incident. Mr. Greer stated that Welch apologized for his behavior and indicated that his problem was with Fuller and would be dealt with later
Jarell Theus, a sixteen-year old student, testified he was not in school on the day of the shooting, but was going to his cousin's house in the neighborhood where the shooting occurred. While walking to his cousin's house, the witness saw a man dressed in black walking a dog. Later, as he was walking to the store, the witness saw the man standing in a yard when a white SUV pulled up near the man. Jarell watched as the two men talked and the man dressed in black backed up into the yard between two cars. After seeing the man raise his jacket up and hearing two or three shots from a pistol, the witness and his cousin ran off. As he was running, the witness heard what sounded like automatic gunfire. While Jarell did not recognize the person who exited the vehicle, he later learned it was Fuller and Jarell knew the defendant as he was an acquaintance of Jarell's brother. After the testimony of Jarell Theus, the defense concluded its case.
We find that the evidence presented by the state was sufficient to support the defendant's conviction for manslaughter. By the defendant's admission and the testimony of the state's witnesses, the state established that the defendant did in fact shoot the victim. Establishing this fact is necessary to determine whether the shooting was done in sudden passion or heat of blood such to render it a manslaughter as opposed to the charged offense of second degree murder.
Apparently, the trier of fact chose to believe Fuller's testimony regarding the provocation by the victim which led to the shooting. Testimony established that Welch had threatened and pulled guns on Fuller in the past, and most recently, the day prior to the shooting. There was also testimony that the feud between the men was on going and fueled by rumors of snitching by the defendant. Moreover, the testimony was sufficient to establish that Fuller initiated the encounter between himself and Welch and that Fuller was possibly the aggressor in the situation. Considering all of the testimony and making certain credibility determinations, *1213 there was sufficient evidence to establish a guilty verdict of the responsive offense of manslaughter. Based on the record, it can be concluded that the trier of fact found that the shooting was committed in sudden passion or heat of blood. This determination is within the province of the trier of fact and should not be disturbed by this court.
The defendant's argument that the state failed to prove that the shooting was not committed in self defense is not supported by the record. The record is replete with sufficient evidence to establish that the defendant traveled to the victim's mother-in-law's home armed with an AK-47. The forensic evidence showed that only one weapon was fired, and that several of the shots were fired into the back of the victim's body. Additionally, there was testimony presented by the victim's wife and corroborated by the evidence obtained from the scene that the defendant fired at least one shot into the victim as he lay on the ground.
The evidence established beyond a reasonable doubt that the defendant did not act in self defense. There was contradictory testimony of the several witnesses regarding whether or not the victim had in fact fired a gun during the incident. The trial judge was required to make an ultimate determination of this issue, and if he believed that the victim did not have a weapon, there was sufficient evidence to establish that the defendant had not acted in self defense. Even when presented with the argument that the witnesses were biased because of their relationships with either the defendant or the victim and his family, the trial judge chose to believe the testimony of the witnesses that there was not another weapon on the scene at the time, or that the weapon was not produced by the victim.
Considering the factors set forth in State v. Spivey, supra and State v. Hardeman, supra, the state established that the situation immediately before the defendant drove upon the scene was calm as the victim and his wife waited for a ride to their home. Additionally, the defendant, adopting a preemptive strike mentality, sought out the victim and engaged him in the situation. The defendant went to the scene armed with the AK-47 to "talk" with the victim. If the testimony regarding the other weapon is disregarded by the trial judge, then there were certainly other options available to the defendant other than using deadly force. The defendant also had an opportunity to retreat from the situation in his waiting vehicle. However, there was testimony presented that the victim was a bad actor known to carry a weapon, and had in the past threatened the defendant with death. The state presented sufficient evidence to prove that the defendant had not acted in self-defense. The circumstances in no way support any argument that the defendant was in imminent fear of losing his life or receiving great bodily harm such that deadly force was necessary. Although there is no merit in the defendant's contention that he acted in self defense, there was ample evidence to support a verdict of manslaughter.

CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.
BROWN, C.J., concurs with written reasons.
BROWN, Chief Judge, concurring.
I certainly agree with affirming this conviction and sentence. I disagree with the conflicting language in that portion of the majority opinion where it finds that the offense was committed in sudden passion and heat of blood immediately caused by provocation sufficient to deprive an average *1214 person of his self-control and cool reflection, and then, in addressing self-defense, finds that there was no provocation and that defendant simply carried out a "preemptive strike." A preemptive strike is a planned, intentional action and the antithesis of "sudden passion and heat of blood caused by immediate provocation."
The legislature has provided a list of lesser and responsive verdicts. Our courts have recognized that a defendant has a statutory right for a jury, or in this case, judge, to convict defendant of the lesser offense even though the evidence clearly and overwhelmingly supports a conviction as charged. State v. Porter, 93-1106 (La.07/05/94), 639 So.2d 1137. This is called "nullification." I note that the trial judge did not refer to sudden passion or heat of blood in rendering his verdict. He did find that the victim was a man of ill repute. He obviously considered that both the victim and defendant were members of the Rolling 60's gang and that one was destined to kill the other.
All this court needed to say is that the evidence clearly supported the charge of second degree murder and that manslaughter is a legislated responsive verdict to that charge.