## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-236

**STATE OF LOUISIANA**

**VERSUS**

**ROBERT LEE HEARD, JR.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 12-4535
HONORABLE D. JASON MECHE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## PHYLLIS M. KEATY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Phyllis M. Keaty, and Van H. Kyzar, Judges.

**AFFIRMED.**

**Paula C. Marx**
**Louisiana Appellate Project**
**Post Office Box 82389**
**Lafayette, Louisiana  70598-2389**
**(337) 991-9757**
**Counsel for Defendant/Appellant:**
  **Robert Lee Heard, Jr.**

**Earl B. Taylor**
**District Attorney**
**Jennifer Ardoin**
**Assistant District Attorney**
**Post Office Drawer 1968**
**Opelousas, Louisiana  70571**
**(337) 948-0551**
**Counsel for Appellee:**
**State of Louisiana**

**KEATY, Judge.**

Defendant, Robert Lee Heard, Jr., appeals the trial court's conviction and sentence for second degree murder. For the following reasons, we affirm the trial court.

## FACTS & PROCEDURAL BACKGROUND

Defendant, Robert Lee Heard, Jr., stabbed his wife, Demetra Doyle, multiple times, which resulted in her death. On November 20, 2012, Defendant was indicted on a charge of first degree murder in violation of La.R.S. 14:30. He filed a motion to quash the indictment, which the trial court granted based upon its finding that it was unconstitutionally vague as applied. On appeal, this court reversed the trial court's ruling and remanded the matter for further proceedings. *See State v. Heard*, 15-873 (La.App. 3 Cir. 4/6/16), 215 So.3d 825. Following remand, the State amended the indictment to charge Defendant with second degree murder in violation of La.R.S. 14:30.1. The matter proceeded to trial by jury on August 17, 2017, after which Defendant was found guilty pursuant to an eleven-to-one verdict. On August 24, 2017, Defendant orally presented a "Motion for Judgment of Acquittal or in the Alternative Motion for New Trial," which was later filed on August 29, 2017, and alleged that the evidence presented at trial supported a conviction of the lesser included offense of manslaughter. The trial court denied Defendant's motion and, thereafter, sentenced him to a mandatory life sentence without benefit of probation, parole, or suspension of sentence. Defendant appealed.

On appeal, Defendant asserts the following assignments of error:

I.    The evidence is insufficient to support the guilty verdict of second degree murder; [Defendant] was provoked and killed his wife; the offense squarely fits within the definition of manslaughter.

II.    The conviction of second degree murder should not stand as it results from a non-unanimous jury verdict, which supports the

sufficiency argument herein that the state failed to prove its case beyond a reasonable doubt.

## DISCUSSION

### I.     Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

### II.     First Assignment of Error

In Defendant's first assignment of error, he contends that the evidence adduced at trial supports the lesser included offense of manslaughter rather than second degree murder. Defendant does not contend that the State failed to prove the elements of second degree murder; rather, his argument is that he should have been convicted of manslaughter.

When the sufficiency of evidence claim is raised on appeal, this court in *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, discussed the following inquiry to be used by the reviewing court:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

2

Second degree murder "is the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1. Manslaughter is defined by La.R.S. 14:31(A)(1), which states in pertinent part:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

Keeping in mind the foregoing jurisprudence and statutory law, we will now examine the evidence presented at trial in this matter to determine whether the jury could have found that the State proved beyond a reasonable doubt that Defendant was the person who killed his wife, the victim.

Carolyn Booker, an employee of the Acadiana Crime Lab, testified for the State at trial. She was accepted as an expert in forensic science with a specialty in DNA analysis. Booker noted that Demetra's fingernail clippings contained her own blood along with a second, minor contributor. A partial DNA profile was obtained which "could not exclude Robert Heard" as the minor contributor. According to Booker's statistical analysis, "the probability of selecting an unrelated individual having the same minor profile was 1/130,000." Booker revealed that she examined a knife which contained Demetra's blood on the blade and at least three DNA profiles on the handle, i.e., Demetra and two other women. Booker stated that a pair of men's shoes were examined and contained the presence of Demetra's blood, although no conclusions could be made regarding the presence of Defendant's DNA. Booker noted that the presence of DNA on shoes may be impossible to detect when the individual wearing the shoes wears socks. On cross-examination, Booker noted

3

there were many ways Defendant's blood could have gotten under the victim's fingernails.

Dr. Christopher Tape, who was accepted as an expert in medical science with a specialty in forensic pathology, also testified on the State's behalf. Dr. Tape testified that he performed Demetra's autopsy wherein he noted numerous stab wounds. He recalled a particular stab wound which pierced Demetra's jugular, larynx, and thyroid, and would have been fatal "without immediate medical intervention." Dr. Tape revealed that Demetra suffered from injuries to her lungs and heart and opined that the wound to her heart would have been fatal. According to his testimony, Demetra also sustained multiple wounds to her liver, stomach, and small intestines. Dr. Tape indicated that wounds on Demetra's arms could be defensive wounds "depending on how you are covering yourself." He testified that Demetra's body was delivered face down with a knife sticking into her back. Dr. Tape stated that there were nine stab wounds on her back, one of which hit the vertebrae. He described the presence of charring, i.e., browning discoloration, of the skin on Demetra's back and buttocks. Dr. Tape revealed that Demetra's body contained "forty sharp force injuries[,]" including two incise wounds and thirty-eight stab wounds. He opined that Demetra's death was caused by "[s]tab wounds to the head, body and extremities."

On cross-examination, Dr. Tape opined that Demetra was physically alive during the forty sharp force injuries given the presence of blood with the stab wounds. He was unable to say, however, whether Demetra passed out or otherwise was unable to fight back during that time. When asked about "overkill," Dr. Tape responded:

> It's a term I never use, but, . . . it falls in line with overkill or sometimes they talk about crimes of passion . . . and it's where you stab somebody more times than they need. . . . [T]he thing about my experience of stab wounds is that unless you're a professional assassin

4

you don't necessarily know how to stab somebody to kill [them]. . . . So, if your intent is to kill and you stab somebody once and they're not dead you're [going to] keep stabbing [them] until they're dead whether it's overkill, crime of passion or otherwise, . . . it's just they're trying to kill the person and the first time didn't work out so they have to keep stabbing.

Mark Kurowski, an employee of the Acadiana Crime Lab, was accepted as the State's expert in forensic science. He was questioned regarding photographs taken of bloody footprints from the crime scene and a pair of Air Jordans, i.e., shoes, containing blood. Given the "poor quality" of the photographs, Kurowski was only able to determine that the footprints and Air Jordans were similar in design. He also testified regarding the pieces of a second, broken knife and noted that multiple pieces of plastic recovered were all part of the knife's handle.

Devin Johnson, who testified on the State's behalf, had known Demetra for years and advised that she was best friends with his ex-wife, Natalie Strauss. According to Johnson, Demetra was at his house on the evening she died. He explained that approximately thirty or forty-five minutes after Demetra left, he received a phone call from Defendant, who explained that he had killed Demetra, requested the couple to proceed to Defendant's home, and asked Johnson to tell Strauss that Defendant was sorry. Johnson testified that he and Strauss went to Defendant's house, opened the door, found Demetra's body, and called the police. On cross-examination, Johnson denied telling Officer A.J. Frank that Defendant told Johnson he witnessed Demetra sleeping with another man. On rebuttal, the State introduced into evidence a copy of Johnson's written statement given after the discovery of Demetra's body and a video recording of Johnson's interview with the Eunice Police Department.

Strauss, who also testified on the State's behalf, spoke to Demetra on the telephone on the day of the killing. Following their telephone conversation, Demetra

5

went to Strauss' home where Demetra revealed that she was unhappy for no particular reason. Strauss revealed that Demetra, who did not appear agitated, left Strauss' house approximately "a few minutes before ten." About forty-five minutes later, Johnson received a telephone call wherein Strauss "could see he was shocked. . . . Like[] he couldn't believe what he was hearing." Strauss indicated that the telephone conversation lasted for a few seconds, after which Johnson told her: "'[Defendant] said he just killed [Demetra], and to tell you he was . . . sorry.'" Strauss testified that they subsequently went to Demetra's house and found her laying on the floor.

On cross-examination, Strauss initially was unable to remember talking to Demetra about other men that she, i.e., Demetra, was interested in from the past. She also could not recall talking to Demetra about her heart not being in her marriage with Defendant. After Strauss' memory was refreshed with copies of text messages between herself and Demetra, Strauss acknowledged a text message which occurred the day before Demetra died and contained the names of three men, i.e., Rico, Randy, and Jamie. Strauss admitted that when she mentioned "those three names[,] that had [nothing] to do with Demetra actually [having] interaction with those guys [during] her marriage. Never." Strauss stated that "[w]hen Demetra left my house [the] night [of the murder], she had no intentions of [getting] a divorce. However, she wasn't happy."

Richard Daigle, the Deputy Chief of Police for the Eunice Police Department, testified that an empty bottle of rubbing alcohol was found near Demetra's body and a yellow washcloth was discovered in the bathroom sink. A picture of the washcloth entered into evidence revealed the presence of red stains. Chief Daigle advised that there were clothes scattered on the bed although it was unnecessary to determine

6

who they belonged to "unless they [had] some type of stains on them such as blood stains." He noted that there "are a lot of houses we've been into, people are real messy." Chief Daigle acknowledged that there was no way to determine whether the clothes were scattered across the room before or after the murder.

Officer Mike Hidalgo of the Opelousas Police Department also testified at trial. He initially met Defendant in Shreveport and observed "scratches on his left arm" and "a cut" on one of the fingers on Defendant's right hand. Officer Hidalgo was unsure as to the cause of Defendant's scratches. He was then asked about Calvin Hardy, a man who was questioned by Sergeant A.J. Frank regarding whether Hardy had an extramarital affair with Demetra. Officer Hidalgo testified that he may have asked Hardy three questions during Sergeant Frank's interview of Hardy. Officer Hidalgo testified he did not have a purpose in interviewing Hardy because it was not his interview. Officer Hidalgo could not recall whether anyone requested or obtained a DNA sample from Hardy although he did not personally obtain one.

Sergeant Frank, with the Eunice Police Department, testified on behalf of Defendant. Sergeant Frank, who was the lead detective, advised that he obtained information from Johnson indicating that Defendant may have been responsible for Demetra's death. Sergeant Frank acknowledged that upon his arrival at the murder scene, he saw two knives, bloody shoes, a bloody washcloth, and a bloody towel. He testified that he questioned Hardy to determine whether he and Demetra were having a sexual relationship. Sergeant Frank advised that he never requested a sample of Hardy's DNA nor did he request DNA swabs of Demetra's vaginal area. According to Sergeant Frank, Demetra and Defendant's cell phones were seized. He revealed that Defendant fled the murder scene and was apprehended a day and a half later in Shreveport. Sergeant Frank noted that he did not see anything near

7

Demetra's body that may have caused the charring to her buttocks except for the alcohol bottle. Sergeant Frank revealed that he did not interview Hardy as a potential suspect. Rather, he interviewed Hardy to determine the cause of Demetra's murder.

Defense counsel recalled Strauss to further question her regarding her text messages with Demetra prior to the murder. According to Strauss, she instructed Demetra to work on her marriage rather than to think about previous relationships. Strauss acknowledged receipt of two text messages from Demetra's phone the day after she was murdered. The text messages stated: "Y u text her all that shit about them other niggas huh its you fault [sic]" and "U next im coming for u." Strauss noted that she never mentioned Hardy during her text messages with Demetra. Strauss revealed that she never witnessed anything which indicated a sexual attraction between Demetra and Hardy. The defense thereafter rested its case.

Based on the above testimony, we find that it was reasonable for the jury to find that the State proved beyond a reasonable doubt that Defendant was the person who killed Demetra and that all of the elements of second degree murder were established. We must next determine whether the evidence supports the lesser included offense of manslaughter. To determine whether manslaughter is applicable, we must use the following analysis as cited by this court in *State v. Perkins*, 11-955, pp. 11-12 (La.App. 3 Cir. 3/7/12), 85 So.3d 810, 817-18 (alteration in original) (quoting *State v. Wright*, 42,956, pp. 13-15 (La.App. 2 Cir. 3/5/08), 978 So.2d 1062, 1071-72, *writ denied*, 08-819 (La. 10/31/08), 994 So.2d 532):

> "Sudden passion" and "heat of blood" are mitigating factors in the nature of a defense; and, when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. *State v. Baker*, 41,555 (La.App. 2d Cir.8/15/07), 962 So.2d 1198, citing *State v. Leger*, 05-0011 (La.7/10/06), 936 So.2d 108, *cert. denied*, [549] U.S. [1221], 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). The burden is on the defendant to prove by a

preponderance of the evidence that he acted in "sudden passion" or "heat of blood." *State v. Robinson*, 32,794 (La.App. 2d Cir. 3/1/00), 754 So.2d 311, *writ denied*, 00-0989 (La.3/23/01), 787 So.2d 1008. The defendant is not obligated to establish the factors affirmatively; the jury may infer them from the evidence presented. *State v. Ellis, supra*, citing *State v. Jackson*, 34,076 (La.App. 2d Cir. 12/6/00), 774 So.2d 1046.

Provocation shall not reduce a homicide to manslaughter if the jury finds that the defendant's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. *State v. Ellis, supra*. "If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act." *State v. Leger, supra*. Questions of provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person with ordinary self-control. *State v. Leger, supra*, citing *State v. Deal*, 00-0434 (La.11/28/01), 802 So.2d 1254, *cert. denied*, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). Physical threats or actions on the part of the victim have been found to be sufficient provocation. *State v. Ellis, supra*, citing *State v. Lombard*, 486 So.2d 106 (La.1986); *State v. Ruff*, 504 So.2d 72 (La.App. 2d Cir. 1987), *writs denied*, 508 So.2d 64, 65 (La.1987). Even so, mere words or gestures, no matter how insulting, will not reduce a homicide from murder to manslaughter. *State v. Mitchell*, 39,202 (La.App. 2d Cir. 12/15/04), 889 So.2d 1257, *writ denied*, 05-0132 (La.4/29/05), 901 So.2d 1063, citing *State v. Massey*, 535 So.2d 1135 (La.App. 2d Cir. 1988).

In *State v. Lombard*, 486 So.2d 106, 110-11 (La.1986), the supreme court discussed the burden of proof to support a lesser verdict of manslaughter when a defendant is tried for second degree murder, as is the case here.

The court has stated on several occasions, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. *State v. Tompkins*, 403 So.2d 644 (La.1981); *State v. Temple*, 394 So.2d 259 (La.1981); *State v. Peterson*, 290 So.2d 307 (La.1974). Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Where such proof has been introduced, a second degree murder verdict is inappropriate.

9

On appeal, Defendant argues that "[t]he sheer amount of stab wounds is indicative of a crime of passion," and that "[t]he State did not prove any plan or premeditation on the part of Mr. Heard." Defendant alleges that Demetra was unhappy with her marriage, mentioned other men's names, and may have been packing to leave. Thus, Defendant's argument in support of manslaughter rests upon three alleged acts of provocation: Demetra's dissatisfaction in the marriage, her leaving Defendant, and her possible infidelity.

Our review of the evidence, when viewed in the light most favorable to the prosecution as required under *Jackson*, 443 U.S. 307, fails to support Defendant's alleged acts of provocation which would support a manslaughter conviction. First, there is no evidence in the record indicating that Defendant was aware of Demetra's dissatisfaction in the marriage. Despite the text messages between Strauss and Demetra wherein she indicated she was unhappy in her marriage, the conversation occurred approximately thirty hours before the murder. Moreover, there is no evidence showing that Defendant knew of the information contained in the text messages prior to the murder. Second, there is no evidence showing that Demetra was planning to leave Defendant. Specifically, Strauss testified that Demetra had no intention of getting a divorce when she left Strauss' house the evening of the murder. The clothes thrown across the bed at Defendant's home may have been nothing more than a messy room, according to the testimony. Further testimony reveals that it could not be determined whether the clothes were thrown around before or after the murder. Third, there is nothing in the record supporting Demetra's possible infidelity, including a possible affair with Hardy. Specifically, Johnson denied telling Officer Frank that Defendant told him, Johnson, that Defendant observed Demetra sleeping with another man. Strauss also testified that she

observed no sexual attraction between Demetra and Hardy and that Demetra was not cheating on Defendant with the three men mentioned in their text message the day before the murder.

Accordingly, Defendant's first assignment of error lacks merit.

## III.    Second Assignment of Error

In his second assignment of error, Defendant contends that his conviction for second degree murder should not stand because it results from a non-unanimous jury verdict, which supports the sufficiency argument herein that the State failed to prove its case beyond a reasonable doubt.  Defendant's argument fails in light of La.Code Crim.P. art. 782(A), which provides, in pertinent part:  "Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict."  That particular statute was ruled constitutional in both *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738, and *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972).

Accordingly, Defendant's second assignment of error is without merit.

### DISPOSITION

The trial court's conviction and sentence are affirmed.

**AFFIRMED.**

11