# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 22-378


**STATE OF LOUISIANA**

**VERSUS**

**ROBERT LEE HEARD, JR.**



**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 12-K4535-D
HONORABLE D. JASON MECHE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**GARY J. ORTEGO**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Chief Judge, Sylvia R. Cooks, Charles G. Fitzgerald, and Gary J. Ortego, Judges.


**AFFIRMED; REMANDED FOR**
**CORRECTION OF SENTENCING MINUTES.**

**Paula Corley Marx**
**Louisiana Appellate Project**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Robert Lee Heard, Jr.**

**Chad Patrick Pitre**
**District Attorney 27th JDC**
**P.O. Box 1968**
**Opelousas, LA 70571**
**(337) 948-3041**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **State of Louisiana**

**Kathleen E. Ryan**
**Morrow, Morrow, Ryan**
**P. O. Drawer 1787**
**Opelousas, LA 70571-1787**
**(337) 948-4483**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **State of Louisiana**

**ORTEGO, Judge.**

A brief procedural history of this criminal proceeding is necessary as to this appeal.

Following Defendant's first trial on August 17, 2017, the jury found Defendant guilty by an 11-1 jury verdict. Defendant appealed his conviction and sentence, contending, among other things, that his conviction was illegal because of the non-unanimous verdict. On November 7, 2018, this court affirmed Defendant's second-degree murder conviction and life sentence. *State v. Heard*, 18-236 (La.App. 3 Cir. 11/7/18), 258 So.3d 875, *writ denied*, 18-2013 (La. 4/29/19), 268 So.3d 1029, and *writ denied*, 18-2022 (La. 4/29/19), 268 So.3d 1033. Thereafter, on April 27, 2020, the United States Supreme Court remanded that first case to this court, finding that a unanimous verdict should have been required to find Defendant guilty, considering its *Ramos* decision.[1] *Heard v. Louisiana*, __ U.S. __, 140 S.Ct. 2713 (2020). Pursuant thereto, this court vacated Defendant's conviction and sentence, and remanded the matter for a new trial. *State v. Heard*, 18-236 (La.App. 3 Cir. 12/16/20), 309 So.3d 802.

Defendant's second trial resulted in Defendant's conviction of second-degree murder, by the unanimous verdict as required by *Ramos*. In accordance with this unanimous verdict, rendered on April 14, 2022, the trial court sentenced Defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence. This appeal followed.

Defendant's current appeal challenges the sufficiency of the evidence, as well as a jury instruction regarding the number of votes required for acquittal

---

[1] *Ramos v. Louisiana,* 590 U.S. __, 140 S.Ct. 1390 (2020).

## FACTS

The facts presented during this trial, conducted April 12-14, 2022, are discussed in Assignment of Error No. 1.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent. The minutes of sentencing, however, require correction.

Although the sentencing transcript indicates the trial court imposed Defendant's sentence at hard labor, the minutes of sentencing do not state such. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La.9/21/01), 797 So.2d 62. Accordingly, we remand this matter to the trial court, and the trial court is ordered to amend the sentencing minutes to reflect that Defendant's sentence is to be served at hard labor, and the trial court is ordered to provide the Defendant with notice of the amended sentencing minutes, within thirty (30) days.

## ASSIGNMENT OF ERROR NO. 1

In this assignment of error, Defendant contends the evidence presented at trial meets the definition of manslaughter however was insufficient to support a conviction of second-degree murder. In reviewing the sufficiency of evidence, this court has set forth the standard of review as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393

2

So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Thacker*, 13-516, p. 5 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, 804 (quoting *State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580).

As for appellate review, in cases relying on circumstantial evidence, this court has stated the following:

When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10-11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826-27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 138 S.Ct. 392 (2017).

*State v. Worley*, 21-688, pp. 3-4 (La.App. 3 Cir. 8/3/22), __ So.3d __.[2]

La.R.S. 14:30.1 defines second-degree murder as the "killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:31(A) defines manslaughter as a homicide "committed in sudden

---

[2]The Westlaw cite is 2022 WL 3051985.

passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." The manslaughter statute further provides that "[p]rovocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed."

> "Sudden passion" and "heat of blood" which distinguish manslaughter from homicide are not elements of the offense, but mitigatory factors exhibiting a degree of culpability less than is present when the homicide is committed without them. *State v. Tompkins*, 403 So.2d 644 (La.1981); *State v. Arnold*, 30,282 (La.App.2d Cir.1/21/98), 706 So.2d 578; *State v. Armstrong* 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, *writ denied*, 99-3151 (La.4/7/00), 759 So.2d 92. A defendant who shows by a preponderance of the evidence that these mitigatory factors are present is entitled to the verdict of manslaughter. *State v. Lombard*, 486 So.2d 106 (La.1986). However, the defendant is not obligated to establish the factors affirmatively; instead, the jury may infer them from the overall evidence presented. The reviewing court's function is to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the state, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Lombard, supra.*

*State v. Jackson*, 34,076, pp. 3-4 (La.App. 2 Cir. 12/6/00), 774 So.2d 1046, 1049.

> As noted by the court in *State v. Lombard, supra,* provocative acts held to rise to the level of mitigating conduct involve physical threats or actions on the part of the victim. *See also State v. Ruff*, 504 So.2d 72 (La.App. 2d Cir.1987), *writs denied*, 508 So.2d 64, 65 (La.1987). Mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter. *State v. Massey*, 535 So.2d 1135 (La.App. 2d Cir.1988).

*State v. Mitchell*, 39,202, pp. 11-12 (La.App. 2 Cir. 12/15/04), 889 So.2d 1257, 1263, *writ denied*, 05-132 (La. 4/29/05), 901 So.2d 1063.

## EVIDENCE PRESENTED AT TRIAL

The State's first witness, Denise Guidry, (Ms. Guidry) the deceased victim's mother, testified that the victim, Demetra Doyle, (Ms. Doyle) was thirty-seven years old, married to Defendant, Robert Lee Heard, Jr., and had three boys, when she died.

Ms. Guidry testified that Ms. Doyle and Defendant, were married approximately three to four months prior to Ms. Doyle's death.

Also, Natalie Strauss, (Ms. Strauss) the victim's cousin and best friend, testified the victim, Ms. Doyle, visited her approximately every other day, and she last saw the victim on the Friday night she was killed. She testified that the victim visited Ms. Strauss's home from about 8:00 until approximately 10:00 p.m., and the victim indicated that she would see Ms. Strauss later at Club Diamond in Eunice, that Ms. Strauss owned. This testimony was corroborated by De'ja Malveaux, a lifelong acquaintance of the victim, who testified that she and. Ms. Doyle had plans to go out on the night the victim was killed, and that the victim was supposed to pick her up around 11:30.

Ms. Strauss testified that approximately thirty to forty-five minutes after the victim left her home, Devin Johnson, (Mr. Johnson) Ms. Strauss's husband, received a startling phone call from the Defendant about him killing the victim, Ms. Doyle. When Mr. Johnson told Ms. Strauss about his conversation with Defendant, the two left and went to the victim's home. When Ms. Strauss and Mr. Johnson arrived at Ms. Doyle's home, the victim's front door was open, Ms. Strauss saw the victim's body, and called 9-1-1. She also noticed the victim's car was gone from Ms. Doyle's home and knew that Defendant did not own a car.

Ms. Strauss further testified that earlier in the day, before visiting with Ms. Strauss, the victim called numerous times telling her she wanted to talk to her. During their conversation that day, the victim said that she was unhappy in her marriage to Defendant, that was controlling, "She couldn't be herself" and basically, she was just unhappy. Ms. Strauss testified that her advice to the victim, who had only been married to Defendant for three or four months, was that the first year of marriage is "very, very hard" and that the "grass ain't greener on the other side."

Ms. Strauss testified that she advised that "sometimes, you know, you need to just work through what you got." The two had corresponded via text the previous day. Ms. Strauss testified that before the victim and Defendant's wedding, she had discouraged Ms. Doyle from "rushing into marriage", and tried to get the victim to wait, but Ms. Doyle wanted to be married.

The State also called Mr. Johnson, Ms. Strauss's husband at the time, who testified that he was home that Friday night before he and his wife left to work at their Eunice nightclub, the "Club Diamond." Before they left, the victim came to visit his wife, as she often did, and she arrived at about 7:30 or 8:00 p.m., and Ms. Doyle left their home a couple hours later. Mr. Johnson testified that about thirty to forty-five minutes after the victim left, he received a phone call from Defendant, who told Mr. Johnson that he [Defendant] had killed the victim, Ms. Doyle, and to "go by the house; tell [Ms. Strauss] he was sorry." Mr. Johnson and Ms. Strauss then went to the victim's home, but neither entered once they peered in, and saw the victim's body, and that she was not moving. They then called the police, who arrived about fifteen minutes later. Mr. Johnson's written statement about the phone call he received was essentially the same, except that the written statement did not mention Defendant's apology to his wife.

Alaray John (AJ) Frank, a former detective with the Eunice Police Department, and lead investigator in the case, testified that he first spoke with Mr. Johnson at the scene, then again at the police station. Detective Frank testified that Mr. Johnson told him that when Defendant called him, Defendant said when he returned home from work, he caught Calvin Hardy and the victim engaged in sexual intercourse. Detective Frank conceded that this information did not appear in either Mr. Johnson's written or video statement. Detective Frank testified that he drafted his report twelve to thirteen days after the incident, so it was possible he confused

the statement about the victim and Calvin Hardy having sex with another person's statement, and agreed that had Mr. Johnson said this, Detective Frank said he would have asked Mr. Johnson to put it in his written or video statement.

Detective Frank testified that he also interviewed Calvin Hardy (Mr. Hardy). Detective Frank questioned Mr. Hardy and asked whether Mr. Hardy had any contact with the victim on the day in question, and Mr. Hardy said he had not. Detective Frank testified that he did not recall Mr. Hardy telling him that he ran into the victim at Chaney's store shortly after noon. Detective Frank then testified that he did not obtain a DNA swab from Mr. Hardy, although Mr. Hardy offered to provide one, because he did not feel it was necessary after his investigation. Detective Frank further testified that through the course of investigation, he learned that the victim and Mr. Hardy were very close, "friendship-wise." Detective Frank also spoke with various people that Defendant had spoken, and given his story of the events of that night. At the conclusion of his investigation, Detective Frank rejected Defendant's story that this was "about an affair Heard had witnessed between Calvin Hardy and his wife" as claimed by Defendant.

Mr. Hardy was called as a rebuttal witness by the State. Mr. Hardy testified that at the time of trial, he was forty-two years old, and he had known the victim, Ms. Doyle, nearly his whole life, and that they were related by marriage and were best friends. Mr. Hardy stated that he had described their relationship to Detective Frank as "like we're brothers and sisters," and Mr. Hardy was the godfather of the victim's oldest son. Mr. Hardy testified that he and the victim saw each other on an "almost daily" basis, either on the street, or at friends' and family's houses, but he had never been to the victim and Defendant's house. Mr. Hardy testified that he saw Ms. Doyle at the "corner store" on Thursday, the day before she died. However, during later questioning, when Mr. Hardy was shown his recorded statement, he said

it was either Thursday or Friday. Mr. Hardy further testified he never had a romantic involvement with the victim, and the two had never had sex. Mr. Hardy confirmed that he had previously said they were so close that the victim once had sexual intercourse with someone in the bed next to him. He also confirmed that he recalled saying in his video statement that she was probably "with" Norman, one of her ex-boyfriends. Mr. Hardy further testified that he had heard, from different people, of Defendant's accusations about him having sex with the victim on the day Ms. Doyle was killed. According to Mr. Hardy, he was never asked for a DNA sample, but had he been asked, he would have voluntarily given one.

Detective Mike Hidalgo, of the Opelousas Police Department, testified that on the day following Ms. Doyle's death, he saw Defendant in Shreveport, where he had been arrested driving the victim's vehicle. Detective Hidalgo stated he observed scratches on the top front of Defendant's left arm, and on his bottom forearm, along with a deep cut on the third joint of the small finger on Defendant's right hand. Detective Hidalgo also identified Defendant's signature, which had previously been obtained by Detective Frank from Defendant on a permission form to secure a DNA sample from Defendant.

Forensic pathologist, Dr. Christopher Tape, also testified at trial. Dr. Tape was accepted by the court as an expert in the field of forensic pathology. His autopsy report showed the victim suffered an incise wound across the palm of her right hand, and across her fourth finger, a stab wound on the back of her right hand and on the palm side of her hand, and testified that all four were consistent with defensive wounds. Additional wounds included five stab wounds to her head and neck, eight stab wounds to her chest, nine stab wounds to her back, with the knife embedded in her mid-upper back, eleven stab wounds to her abdomen, one stab wound to her lower extremities, and two stab wounds to her upper extremities. In total, there were

two incise wounds, and thirty-eight stab wounds. As for which wound(s) caused the victim's death, Dr. Tape first testified that the blood surrounding the lungs and heart prevented them from working properly, which along with blood loss and blood in the airways, caused the victim's death. He later explained:

> Anything that enters the thoracic cavity or damage[s] the major artery or vein can cause a death---or major organ can cause a death. When you get multiple it just can happen that much quicker. But even beyond that let's say that none of these stab wounds went into the abdomen or the chest or hit any major organs, but you just have the cuts themselves.
> . . . .
>
> And they're all deep enough cuts---you know, it's the idea of a thousand cuts---you will bleed to death. So even without any thoracic cavity these many stab wounds, you might die regardless of underlying injuries.

On cross-examination, Dr. Tape testified that of her wounds "they could have all cause[d] death in combination." There was also charring, or thermal injury, on the victim's buttocks, which origin was unknown, and none of the wounds appeared to be post-mortem.

Carolyn Booker, a former DNA analyst for the Acadiana Crime Lab, who was accepted by the court as an expert in forensic science with a specialty in DNA analysis, also testified. Ms. Booker testified that DNA was found on the right fingernail clippings retrieved from the victim's body, and Ms. Booker was able to then develop a partial profile. She testified that the victim was the major contributor of the DNA found, but Defendant could not be excluded as a minor contributor. Ms. Booker then explained that the probability of selecting an unrelated individual at random having the same profile was approximately one in one hundred thirty thousand.

DNA analysis done on the knife handle showed a mix of the victim's DNA and two other female contributors, and no male DNA was detected. Ms. Book explained that on knife handles, there is typically "a lot more DNA and blood than

there is just from the skin cells that a person might leave from handling something . . . [and] often times the blood masks or hides whatever DNA might be there from somebody holding it from contact." Ms. Booker also examined a pair of Nike Air Jordan shoes and found the victim's blood on both shoes, and the laces and inside of the shoes were swabbed to identify the "wearer" of the shoes. The victim's DNA was found on the left shoelaces, and a DNA mixture of three people, including the victim, was found on the inside of the shoe, with no conclusion as to Defendant. The right shoelaces revealed a DNA mixture of two contributors, but it was inconclusive as to Defendant and the victim. A swab of the interior of that shoe showed a mixture of four contributors, with no conclusion regarding Defendant or the victim as contributors. On cross-examination, it was established that the shoes were size 12.

A pair of Defendant's shorts, that was sent for analysis, revealed a blood stain that was a DNA mixture of at least two people, with the victim being the major contributor to the blood stain found on Defendant's shorts. The minor contributor was incomplete for comparison. Additionally, inside the waistband of Defendant's shorts was a DNA mixture of at least two people, the Defendant and the victim could not be excluded as two of the contributors, and the profile for a third contributor was incomplete.

The defense re-called Ms. Strauss as a witness. She was questioned about a text message exchange she and the victim had the day before the victim's death, where the two discussed the state of the victim's marriage. Essentially, in these messages, Ms. Strauss reminded the victim she had encouraged her to wait to get married because marriage is difficult. Although Ms. Strauss said she liked Defendant, she wanted Ms. Doyle, the victim, to wait to make sure the marriage to him is what she really wanted. In the text, Ms. Strauss also stated:

Our husbands supposed to be our only friends, no other person should make you feel the way you do, that's why I said wait, bc I knew your heart was somewhere else, (Rico. randy, jamie) I knew someone else had a hold on you, now by that happening, you will find everything wrong with your husband and marriage, I really dnt know what advice I can actually give you but to work through your marriage . . . just know that the first 2 years are the hardest, hopefully you wnt give up !!!! I know Robert loves you, I can honestly say that, the simple problems you have with Robert can be fixed, Jamie comes with a lot of baggage, so does any other man, I just know that the grass may look green on the other side but believe me it's brown ass hell. Love you cuz. I here anytime you need me[3]

The victim responded:

I know half of wut ur sayin its not just about Jamie b/c truly if i could ur right i would havr chose to b with rico but i really wasnt tryin to b the rebound girl nd as for randy he will always b n my heart he was fun to b around, but robert nd i dont get along we disagree on everything nd all he does is accuse me of doing something nd everytime we c Jamie his whole demeanor changedi cant dictate where that man goes gurl he like to die wen Jamie walked n church i mean we r not compatible at all i just wanna b single im 4real this time i need time for me . . .

As to Defendant's argument to this court that the evidence presented at trial supported a conviction of manslaughter, instead of second-degree murder, Defendant argues that the victim, Ms. Doyle, had plans to go out without Defendant, her husband, on the night of her death. Defendant contends that this suggests either Ms. Doyle's preparation to leave him, or her involvement with another man. This, the Defendant argues, could have been sufficient provocation to deprive him of his self-control and cool reflection, causing him to commit the homicide in sudden passion or heat of blood.

Additionally, Defendant, in his brief, admits that due to the number of stab wounds sustained by the victim, her defensive wounds, and the scratches and gash on Defendant, that there "may have been an altercation" between himself and the victim. However, and despite this admission, Defendant argues that the sheer number of stab wounds is indicative of a crime of passion or "over-killing," and he

---

[3]Although grammatically incorrect, this is how the text appears in the record.

argues that the State did not prove plan or premeditation on his part. Defendant concludes his argument by stating: "Whether it was dissatisfaction in the marriage, her leaving or possible infidelity that provoked [Defendant] to stab her repeatedly forty times, the crime scene and multiple stab wounds show this was a "crime of passion," and a manslaughter verdict should be rendered."

Although the evidence established that the victim was unhappy in her marriage, as communicated in conversation and through text messages with Ms. Strauss, no evidence was presented to establish that Defendant was even aware of this situation. Ms. Strauss testified that she encouraged the victim to attempt to work things out, and there was no evidence establishing that the victim had plans to leave Defendant, or that she was cheating with the men mentioned in the text exchange between the two. Additionally, Mr. Hardy, the person whom Defendant claimed to have found the victim, having sex with that day, denied any sexual involvement with the victim, and the Defendant presented no competent evidence to rebut same.

We find that the record contains sufficient evidence to support that a rational trier of fact, in this case the jury, viewing the evidence in the light most favorable to the prosecution, could have found that Defendant did not prove by a preponderance of the evidence any mitigating factors, which would entitle him to a judgment/verdict of manslaughter.

The jury obviously believed the testimony of Mr. Hardy, Ms. Strauss, and the other witnesses, and not the Defendant's testimony, as to this issue and assigned error, and thus this being a credibility determination, and as such is not to be second-guessed by this court.

Therefore, we find that the record contains sufficient evidence upon which the jury could have found Defendant guilty of second-degree murder, and therefore conclude that this assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

Defendant's second assigned error contends the trial court erred in not instructing the jury that at least ten jurors must concur to render a verdict of not guilty, instead of instructing them that a unanimous verdict was required for an acquittal.

In *State v. Gasser*, 21-255 (La. App. 5 Cir. 12/16/21), 335 So.3d 342, the defendant was involved in a 2016 road rage incident, and convicted of manslaughter, on a charge of second-degree murder, by a non-unanimous jury. The non-unanimous verdict was later vacated, and the case was remanded for a new trial. When the state again proceeded with a second-degree murder charge, the defense filed a motion to quash, which was granted by the trial court. On appeal, the state argued that since the defendant's non-unanimous guilty jury verdict was unconstitutional per *Ramos*, the Defendant's original conviction was a nullity, which allowed the state to prosecute defendant for second-degree murder.

The Louisiana Fifth Circuit disagreed, and held:

> After the verdict was rendered at defendant's trial, the United States Supreme Court subsequently issued its ruling in *Ramos*, holding that a unanimous jury verdict is required to convict a defendant of a serious offense. The *Ramos* court specifically indicated that its holding applies to cases pending on appeal and to future cases. 140 S.Ct. at 1407. Defendant's case was still on appeal awaiting review by the Louisiana Supreme Court at the time of the *Ramos* decision and thus, defendant was entitled to have his ten to two manslaughter conviction vacated pursuant to *Ramos*. Accordingly, this Court vacated defendant's manslaughter conviction and remanded the case to the trial court for further proceedings. *See Gasser*, 307 So.3d at 1121.

> At the time of defendant's trial in the present case, a unanimous verdict was not required by Louisiana law in order to acquit a defendant. Therefore, when the jury returned a ten to two verdict of guilty of manslaughter, it served as a valid acquittal of the second degree murder charge, precluding retrial of defendant for second degree murder based on the principles of double jeopardy. *See* La. C.Cr.P. art. 598(A).

13

> After review, we find no error in the trial court's judgment granting defendant's Motion to Quash Second Degree Murder Indictment on the grounds of double jeopardy. Accordingly, we affirm the trial court's judgment providing that defendant cannot be retried for second degree murder.

*Id. a*t 347 (footnote omitted).

The Louisiana Supreme Court granted the state's writ application and held that although the verdict was later declared unconstitutional because it was valid at the time rendered, double jeopardy precluded retrial on the original second-degree murder charge. The court went on to state:

> We likewise find it unnecessary to address the issue of whether a nonunanimous verdict is required for an acquittal post-*Ramos*. First, *Ramos* only addressed the constitutionality of non-unanimous verdicts to convict and made no findings with respect to acquittals. Second, the only issue before this Court is whether the State may retry defendant on the higher charge of second-degree murder. Whether a unanimous jury is required for an acquittal has no impact on the issue in this case. Even assuming, for purposes of argument, that a unanimous verdict is required for an acquittal post-*Ramos*, because defendant's conviction for manslaughter was legal and valid at the time that it was rendered, it operated as an acquittal of second-degree murder, as we have found. Thus, although we express no opinion on this issue at this time, even if unanimity is now required for an acquittal, this rule cannot invalidate a lawful acquittal, even one implied by the conviction of a lesser included offense.
> Again, an acquittal is unassailable. The issue of unanimity in a jury's acquittal is simply not before the Court in this case and we decline to issue any prospective advisory opinion on this issue.

*State v. Gasser*, 22-64, pp. 22-23 (La. 6/29/22), __ So.3d __, __.[4]

Prior to the Louisiana Supreme Court's decision in *Gasser*, this circuit addressed the issue of whether a defendant was entitled to a jury instruction that at least ten jurors must concur to find a defendant guilty. This court concluded that *Ramos* did not support the defendant's argument that he was entitled to the requested jury charge, and that the Supreme Court's analysis in *Ramos* indicated that the Constitution required unanimity in *all* verdicts, not just guilty verdicts:

---

[4]The Westlaw citation is 2022 WL 2339163.

14

While *Ramos* does not specifically address a nonunanimous verdict of not guilty, arguably permitting a lesser requirement than a verdict of conviction, we can find no other jurisprudence to suggest the standard for a verdict of not guilty, or an acquittal, to be less than that required for conviction. We conclude from the Supreme Court's analysis in *Ramos* that the Constitution requires unanimity in all verdicts, not just guilty verdicts.

*State v. Rodgers*, 21-190, p. 5 (La.App. 3 Cir. 4/14/21), 318 So.3d 315, 318, *writ denied,* 21-675 (La. 9/27/21), 324 So.3d 87.

Although the Supreme Court in *Gasser* noted that *Ramos* made no finding with respect to acquittals, it clearly stated that "[t]he issue of unanimity in a jury's acquittal is simply not before the Court in this case and we decline to issue any prospective advisory opinion on this issue." *Gasser, supra.* Although Defendant contends this court should reconsider its holding in *Rodgers,* in light of the supreme court's ruling in *Gasser,* we decline Defendant's invitation here to reconsider our holding in *Rodgers*, as they are not inconsistent.

While it is true that both *Gasser and Ramos* explicitly declined to address the issue of nonunanimous verdicts of not guilty, this court in *Rodgers* did address the issue, and concluded that unanimity is required for all verdicts. Thus, at this point in time, we believe that *Rodgers* remains good law. Therefore, we conclude that the trial court in the instant case did not err by failing to instruct the jury that a non-unanimous verdict was required for an acquittal. Accordingly, we conclude that Defendant's second assigned error lacks merit.

## DECREE

Defendant's conviction and sentence are affirmed; and we remand this matter with orders that the trial court amend the sentencing minutes to properly reflect that Defendant's sentence is to be served at hard labor, and to provide the Defendant with notice of the amended sentencing minutes, within thirty (30) days.

**AFFIRMED; REMANDED FOR CORRECTION OF SENTENCING MINUTES**.