774 So.2d 1046 (2000)
STATE of Louisiana, Appellee,
v.
Paul Gary JACKSON, Appellant.
No. 34,076-KA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 2000.
*1048 J. Wilson Rambo, Louisiana Appellate Project, Monroe, Counsel for Appellant.
Richard Ieyoub, Attorney General, Jerry Jones, District Attorney, H. Stephens Winters, Assistant District Attorney, Counsel for Appellee.
Before GASKINS, DREW and KOSTELKA, JJ.
GASKINS, J.
The defendant, Paul Gary Jackson, appeals from his conviction of second degree murder and his sentence to life imprisonment without benefit of parole, probation, or suspension of sentence. For the following reasons, we affirm the conviction and sentence.

FACTS
On June 7, 1997, Paul Gary Jackson stabbed two women with two kitchen knives. The victims were Lori Thomas, his girlfriend, and Lori's mother, Ellen Thomas. Ellen Thomas was stabbed numerous times, but survived. Lori Thomas was stabbed in the back three times. She bled to death, with the blade of one of the knives broken off in her back. Neighbors witnessed Jackson committing the stabbings and testified that he ceased stabbing Lori Thomas only when he was forced to, at gunpoint, by a man who happened to be driving by.
Jackson was arrested a short distance from the scene wearing a pair of shorts with no shirt. He had blood on his person and clothing. The defendant was arrested and, after being given his Miranda warnings, admitted to law enforcement officers that he stabbed Lori. A grand jury indictment was returned charging the defendant with the second degree murder of Lori Thomas.[1]
The defendant originally entered a plea of not guilty. He later withdrew that plea and entered a plea of not guilty and not guilty by reason of insanity. A sanity commission was appointed and found that the defendant was competent to stand trial. The defendant waived his right to a trial by jury and proceeded to trial by a judge alone. On March 3, 1999, the defendant was found guilty as charged. The defendant filed a motion for post verdict judgment of acquittal, arguing that the evidence supported only a verdict of manslaughter. The motion was denied. The mandatory sentence for second degree murder, life imprisonment without benefit of parole, probation or suspension of sentence, was then imposed upon the defendant. The defendant was granted an out-of-time appeal. He now attacks the sufficiency of the evidence and asserts that the sentence imposed is excessive.

SUFFICIENCY OF EVIDENCE
The defendant argues that the circumstances of this case support, at most, a conviction of manslaughter, not second degree murder. He contends that the offense was committed in "sudden passion" or "heat of blood" sufficient to mitigate against the finding of second degree murder. He also claims that the trial court erred in denying his motion for post verdict judgment of acquittal, based upon the alleged insufficiency of the evidence. These arguments are without merit.
The issue of the sufficiency of the evidence is properly raised by a motion for post verdict judgment of acquittal under La.C.Cr.P. art. 821. In this case, Jackson properly filed such a motion which was denied by the trial court. The criterion for evaluating sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the state proved all elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Clower, 30,745 *1049 (La.App.2d Cir.6/24/98), 715 So.2d 101. That standard, initially enunciated in Jackson and now legislatively embodied within La.C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Smith, 441 So.2d 739 (La.1983); State v. Clower, supra.
It is always the function of the judge or the jury to assess the credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir. 1992), writ denied, 617 So.2d 905 (La. 1993). Where a trier of fact has made a rational determination, an appellate court should not disturb it. Indeed, in the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for the requisite factual conclusion. State v. Clower, supra.
Second degree murder, pursuant to La. R.S. 14:30.1(A)(1), is defined as the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm.
Manslaughter is a homicide which would be either first degree murder or second degree murder, but the offense is committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive a person of his self-control or cool reflection. La. R.S. 14:31. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled at the time the offense was committed. Because the question of provocation is one of fact, the trier of fact must determine whether the offender's blood had actually cooled or whether the average person's blood would have cooled. State v. Knowles, 598 So.2d 430 (La.App. 2d Cir.1992).
"Sudden passion" and "heat of blood" which distinguish manslaughter from homicide are not elements of the offense, but mitigatory factors exhibiting a degree of culpability less than is present when the homicide is committed without them. State v. Tompkins, 403 So.2d 644 (La.1981); State v. Arnold, 30,282 (La. App.2d Cir.1/21/98), 706 So.2d 578; State v. Armstrong 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, 99-3151 (La.4/7/00), 759 So.2d 92. A defendant who shows by a preponderance of the evidence that these mitigatory factors are present is entitled to the verdict of manslaughter. State v. Lombard, 486 So.2d 106 (La.1986). However, the defendant is not obligated to establish the factors affirmatively; instead, the jury may infer them from the overall evidence presented. The reviewing court's function is to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the state, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, supra.
The trial court in this case was presented with conflicting versions of the events connected with this offense. The defendant testified at trial. He stated that he became involved with Lori sometime in 1997. Shortly after they began living together at her residence, they "lost" the house and began staying with Lori's relatives. The defendant stated that Lori was violent when she was drunk and he was aware that she allegedly "cut" two people in the past.
On the date of the offense, the defendant was expecting Lori to pick him up at work so they could go look at a house. She failed to do so. The defendant got a ride to a service station and bought two 30-ounce bottles of malt liquor. He then went to Lori's father's house and drank the liquor and also drank 16 ounces of whiskey. The defendant went back to the service station and bought a 40-ounce bottle of either beer or malt liquor. He then boarded a bus and went in search of Lori. At one point, the defendant got off the bus and drank the liquor in a parking lot. He then boarded another bus and went to the *1050 Triple S Grocery where he purchased another 40-ounce container of beer or malt liquor. The defendant saw Lori in the grocery store with another man. She tried to slap the man and then they got into the man's car. The defendant approached them and asked for a ride to the home of Ellen Thomas, Lori's mother. Along the way, they stopped at a fish market. Lori and the man went inside. As Lori got out of the car, she pulled the keys out of the ignition. According to the defendant, he construed this action as "too personal with someone she hardly knew." The man returned to the car first and upon questioning by the defendant, denied that he had a personal relationship with Lori.
The defendant claimed that Lori was drunk. When they reached her mother's house, the defendant stated that he and Lori went inside and she "cranked it up." She called him a "bat mite" and implied that it was his fault that they did not have a place to live. He stated that he got a 32-ounce container of beer out of the freezer and drank it. The defendant claimed that he grabbed Lori to hug her and he felt some scratches. He then realized that she had a knife and had cut him on the hand. He claimed that at that point he blacked out, stating, "It became dark in that room." The defendant said he thought he disarmed Lori and then he remembered seeing her go outside and fall down in the yard. When he was unable to pick her up, he walked away from the residence.
Ellen Thomas, Lori's mother, was a 59-year-old woman with diabetes. She had lost a leg, was on kidney dialysis and was confined to a wheelchair. At trial, Ms. Thomas testified that her daughter and the defendant had been staying at her house. On the night of the offense, she heard Lori and the defendant arguing before they entered the house. Ms. Thomas stated that the two frequently argued and that she tried to stay out of her daughter's business. According to Ms. Thomas, Lori was not drunk and she never threatened the defendant. Neither Ms. Thomas nor Lori was armed. Ms. Thomas stated that, at one point, Lori walked out of the house. The defendant then stood up and announced that he was going to kill Ms. Thomas and Lori. When Lori reentered the house and sat down, the defendant began stabbing Ms. Thomas, striking her in the arm and hand and inflicting a cut on her face. Although Ms. Thomas stated she did not see the defendant go into the kitchen and get any knives, he had two of her kitchen knives at the time of the stabbing. Ms. Thomas was baffled by the attack, testifying that, "I thought, you know, hey look like he ought to have started with her first. She was his woman not me."
Lori tried to assist in wheeling her mother out of the house to flee from the attacking defendant. The defendant pursued the women and began stabbing Lori. Upon reaching the porch, in the struggle, Ms. Thomas was knocked out of her wheelchair and onto the ground. As the defendant stabbed Lori, she fell to the ground and called to her mother that she could not breathe.
A crowd of spectators gathered outside the house. At one point Lori held onto a railing outside the house to prevent the defendant from dragging her back inside. The defendant ceased stabbing Lori only when a passing motorist stopped and threatened the defendant at gunpoint.
Several juveniles who were passing by Ms. Thomas' house at the time of the altercation testified that they heard arguing coming from the house and saw the defendant slam the door shut. The door reopened and Lori pushed her mother out of the house in her wheelchair. At that point, the women had already sustained some stab wounds. The defendant then pursued Lori and continued to stab her. The defendant was heard to say, "I'm not going to jail for you," and "I love you." A man in a car stopped and demanded at gunpoint that the defendant stop stabbing *1051 Lori. The defendant dropped a knife and the man with the gun threw the knife onto the grass. This knife was recovered at the scene along with the handle of a broken knife.
Lori and Ms. Thomas were transported to hospitals. Ms. Thomas survived the attack, but Lori did not. At the hospital, x-rays showed that the knife blade broke off in Lori's back. According to law enforcement officials, the knife blade worked its way out of the wound during the course of examining the body.
Dr. Stephen Hayne performed an autopsy. He testified that Lori had defensive wounds to her hands, forearms and fingers. She had a slash wound to her chin. She was stabbed in the back three times. One wound was lethal. That wound punctured the right lung, causing Lori to bleed to death. Dr. Hayne noted that there was no smell of alcohol in the contents of Lori's stomach.
Sidney Coleman of the Monroe Police Department testified that on the evening of June 7, 1997, he was the second officer at the scene and issued a description of the defendant over the police radio. A butcher knife with a six-inch blade was found in the yard. The knife was bloody. A cursory search of the house was conducted and blood was everywhere. The officer was then informed that the defendant had been found and he went to a location about one and one-half miles from the house to assist in arresting the defendant. The defendant had blood splattered on his clothing. The defendant had some cuts and was transported to the hospital for treatment. The defendant was then taken to the police station. According to the officer, he could not recall if the defendant was intoxicated, but he did appear to be scared. The defendant kept asking where Lori was and said that he did not mean to hurt anyone.
John Drew of the Monroe Police Department testified that he saw the defendant after the offense and was present when he was arrested. The defendant was wearing green shorts, was very bloody and had some cuts on his hands. The defendant asked if the officers had the black shirt he had been wearing. The shirt was found on the floor inside Ms. Thomas' house. After getting treatment for the defendant's cuts, Officer Drew went back to Ms. Thomas' house. He stated that there was blood everywhere and there was water on the floor as though someone had tried to wash up.
Jimmy Fried of the Monroe Police Department was present when the defendant was informed of his rights. The defendant said that Lori had rejected him. He asserted that Lori attacked him. He claimed that Lori had a knife and was scratching him with it. According to the defendant, in the midst of the argument he went to the kitchen for a beer. He stated that at one point he hit her, but he later denied it. He admitted that he stabbed her but then said that he did not recall stabbing her. The defendant said that he left the scene when someone told him to leave the lady alone. He said that he "lost it right towards the end," and that he snapped.
Detective Evelyn Robinson of the Monroe Police Department conducted the investigation of the offense. She first went to Ms. Thomas' house and then to the hospital upon learning of Lori's death. An x-ray showed that a knife blade was still in the victim's back. In manipulating the body, the knife blade worked its way out.
Detective Robinson administered a waiver of rights form to the defendant. The defendant stated that Lori was rejecting him, which led to a fight. He claimed that she scratched and bit him, but could never show where he was bitten. The defendant never told Detective Robinson that Lori had a knife. The defendant stated that Ellen Thomas asked him and Lori to leave. The defendant first said that he hit Lori, but later admitted that he stabbed her. The defendant stated that he had only consumed a small amount of alcohol. The *1052 defendant was asked whether he was intoxicated and he said "no." Detective Robinson stated that the defendant did not appear to be intoxicated and that she did not smell alcohol on his person.
Jeff Harris of the crime scene identification unit of the Monroe Police Department took photographs of the house. A knife handle with the blade broken off was found inside the residence. A mop was propped up by the back door and some blood was found in the bathroom.
A psychiatrist, Dr. Gerald Robertson, testified at trial. He had examined the defendant and concluded that he did not have a major psychiatric disorder, but was somewhat paranoid. Dr. Robertson stated that alcohol, cocaine, or fatigue would make the paranoia worse.
On appeal, the defendant contends that the evidence was sufficient to convict him of only manslaughter, at the most. He contends that he was drunk at the time of the offense, that he did not go to the kitchen for a knife, that he argued with the victim, that he had cuts on his hand, that he was in shock after the incident, that he did not resist the police and that he "truly loved the victim." He argues that he was angry with the victim for acting too familiar with another man, that they had argued and she had belittled him, and that ultimately she attacked him with a knife.
As stated above, to sustain a conviction of second degree murder, the prosecution must prove beyond a reasonable doubt that a human being was killed when the offender had the specific intent to kill or inflict great bodily harm. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. La. R.S. 15:445; State v. Kahey, 436 So.2d 475 (La.1983).
It is interesting to note that, even though the defendant claimed to have consumed a large amount of alcohol prior to the offense, and asserts that he was drunk, he does not argue that his intoxication precluded the presence of specific intent. La. R.S. 14:15. Evidence was presented that the defendant, while stabbing Lori, said, "you ain't gonna die `cause I ain't going to go to jail for you." This evidence indeed shows that Jackson was not so intoxicated as to preclude cognizance of his actions and the potential ramifications. Evidence was also presented that when the police questioned Jackson within hours of the stabbings as to how much alcohol he had drunk, Jackson said "just a small amount." Further, the police testified that they had detected no odor of alcohol on Jackson and no visible signs of intoxication. While the defendant testified that the doctor at the hospital said that he was two times over the limit, and the hospital records in evidence from that night show the defendant's alcohol level as "223 mg/ dL," there was no expert testimony as to what this meant. Even if the defendant had a high alcohol content level, the trier of fact could have determined from the facts that the defendant was able to form the specific intent to kill Lori. Viewing all the evidence in the light most favorable to the prosecution, the state proved beyond a reasonable doubt that the defendant had the requisite specific intent to kill or inflict great bodily harm upon Lori Thomas.
Rather than contending that he lacked specific intent to kill or inflict great bodily harm, the defendant merely claims that he acted in "sudden passion" or "heat of blood," thereby reducing his crime to manslaughter. Based upon the facts presented, we do not find that these factors were present, immediately caused by provocation sufficient to deprive a person of his self-control or cool reflection.
The defendant gave several different versions of the offense. He claimed that *1053 the victim was drunk and that she was violent when intoxicated. However, the physician who performed the autopsy testified that there was no smell of alcohol in the contents of the victim's stomach. The defendant contended that Lori bit him, but could produce no bite marks. He claimed that the victim "scratched" him with a knife and that he disarmed her after discovering that she cut him. The defendant did not initially tell police that the victim had a knife. Also, the defendant had not one, but two knives from Ms. Thomas' kitchen. These facts are inconsistent with the defendant's speculation that he disarmed the victim after she cut him.
Ms. Thomas testified that Lori was outside the house when the defendant stated that he was going to kill them both. After Lori came back into the house and sat down, the defendant began a brutal attack on Ms. Thomas, not Lori, with no showing of any previous disagreement with Ms. Thomas. Although the defendant was not tried in the present case with the attack upon Ms. Thomas, the evidence shows that he inflicted several very serious knife wounds upon this disabled, older woman, with whom he had no apparent quarrel. It was after Lori intervened to stop the attack upon her mother that the defendant began stabbing her. The defendant was also heard to say that he was not going to jail for Lori and ceased his attack on her only when threatened at gunpoint by a passing motorist. The defendant reentered the house and may have tried to clean up. He then fled the scene.
The record fails to support the defendant's claim that he acted under sudden passion or heat of blood. Lori's actions in riding in a car with the defendant and another man and in taking the keys out of the ignition is hardly provocation for a jealous rage sometime later. Further, even though the defendant and Lori were arguing, Ms. Thomas stated that they did so frequently. Also, Ms. Thomas testified that the attack began after Lori had gone outside the house for a while, giving an opportunity for the defendant's blood to cool. The only support for the defendant's contention that Lori first attacked him with a knife is the defendant's own self-serving testimony. Therefore, the evidence supports the conviction of second degree murder and the trial court did not err in rejecting the defendant's motion for a post verdict judgment of acquittal.

EXCESSIVE SENTENCE
The defendant attacks his mandatory sentence of life without benefit of parole, probation or suspension of sentence as excessive. He argues that the trial court failed to state for the record the factors considered in fashioning his sentence and failed to give appropriate weight to mitigating factors. These arguments are without merit.
It is the legislature's right to determine the length of the sentence imposed for the crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. The decision to assess mandatory life sentences is within the prerogative of the legislature. State v. Armstrong, supra. The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Armstrong, supra. Therefore, the mandatory sentence imposed in this matter is not constitutionally excessive.
Further, failing to articulate reasons for sentence as set forth in La.C.Cr. P. art. 894.1, when imposing a mandatory life sentence, is not an error because setting forth such factors would be an exercise in futility since the court has no discretion. State v. Rose, 606 So.2d 845 (La. App. 2d Cir.1992); State v. Armstrong, supra. Therefore, we find no error in the sentence imposed herein.
When the defendant was sentenced on May 6, 1999, the trial court informed him *1054 that he had three years from the time his conviction and sentence became final to apply for post-conviction relief. Although correct at that time, La.C.Cr.P. art. 930.8 was amended effective August 15, 1999, reducing the time limitation from three years to two years. The defendant's conviction has not yet become final. When it does, he will be subject to the two-year time period. Therefore, the trial court is directed to notify the defendant of the new prescriptive period by letter within thirty days of the issuance of this opinion and to file proof of the defendant's receipt of such notice into the record of the proceedings.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] This trial addressed only the murder of Lori Thomas, and not the charged offense of attempted second degree murder of Ellen Thomas.