Judgment rendered February 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,491-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

LESTER JAY RAMSEY, JR.                      Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 20CR001449

Honorable Bernard Scott Leehy, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Holli Herrle-Castillo

ROBERT STEPHEN TEW                   Counsel for Appellee
District Attorney

HOLLY A. CHAMBERS-JONES
KALEE M. MOORE
GARY A. BLAYLOCK
Assistant District Attorneys

* * * * *

Before STEPHENS, THOMPSON, and ROBINSON, JJ.

**THOMPSON, J.**

Lester Ramsey appeals his unanimous jury conviction for second degree murder and resulting life sentence for the killing of an acquaintance whom he shot twice in the back of the head as the unarmed victim attempted to crawl away from him. After killing the victim, the defendant then wrapped the body in blankets, loaded it into his mother's truck, and dumped it into an alley in town. Following a police investigation, search of the defendant's residence, and several interviews, Ramsey disclosed the location of the victim's body, which had been missing for two weeks after the killing. The defendant argues that there was insufficient evidence to prove that he had not acted in self-defense and that the trial court erred in not declaring a mistrial. Finding these arguments unpersuasive, and for the reasons set forth below, we affirm his conviction.

## FACTS AND PROCEDURAL HISTORY

On February 20, 2020, Lester Ramsey ("Ramsey") was at home with his girlfriend, Journei Cyrus ("Cyrus"), who was eating her dinner in the bedroom, when his friend Cadarion Buggs ("Buggs") arrived at about 11:00 p.m. Buggs and Ramsey were in the living room, watching a movie, smoking marijuana and talking when they got into an argument after Ramsey asked Buggs to tell him who was responsible for a burglary that had occurred previously at his home. Ramsey believed Buggs knew who had robbed his home and taken his gaming system, television, money, and clothing. The burglary was never reported to the police. Ramsey later stated that he was angry because everyone, including Buggs, had been lying about the burglary.

Ramsey testified that he hit Buggs, and they began wrestling. Ramsey threw Buggs to the floor, removing a gun from Buggs' pocket during the struggle. Buggs attempted to leave the room, and Ramsey thought he was going to get a gun that Ramsey had hidden in the couch in the adjoining room. Buggs was crawling away when Ramsey shot at him four times, striking Buggs twice in the back of the head and instantly killing him.

Faced with a dead body in his apartment, rather than call an ambulance or the police, Ramsey borrowed his mother's SUV, wrapped Buggs' body in blankets and a rug, put it in the vehicle, and drove around until he found an alley in which he could dump it. After discarding Buggs' body, Ramsey returned to his home and mopped up the blood with a bleach solution. Neither Ramsey nor Cyrus ever contacted law enforcement about the shooting of Buggs or disposal of his body.

Buggs was reported missing by his mother approximately two weeks later. Detective Justin Cummings, with the West Monroe Police Department, spoke with Buggs' mother and aunt, who gave him information they learned about Buggs' disappearance. This information led Detective Cummings to do a "knock and talk" at Ramsey's home. Detective Cummings described a "knock and talk" as a procedure by which detectives knock on the door of a suspect and speak with whoever answers the door to further their investigation. When Detective Cummings knocked on Ramsey's door, Ramsey answered and was mopping the floors of his home. Detective Cummings asked if Ramsey would come to the detectives' office for an interview. The officers got permission to look for Buggs in Ramsey's home and then Ramsey accompanied them to their office for an interview.

2

Detective Cummings testified that the first time he Mirandized Ramsey was a by verbal advisement at his home. Detective Cummings Mirandized Ramsey again when he arrived at the station for the first time to speak with detectives. Ramsey was given a written copy of his *Miranda*[1] rights, the detective went over each *Miranda* right with him, and then Ramsey signed a waiver of the rights form. The first interview was conducted on March 4, 2020 at 5:00 p.m. Detective Cummings sought and obtained a search warrant for Ramsey's home after the first interview.

Utilizing the search warrant, the police gained entry into Ramsey's home. After discovering multiple areas of blood, the detective went to speak with Ramsey again. At 7:37 p.m. on March 4, 2020, Detective Cummings again provided Ramsey with his *Miranda* rights, and Ramsey signed the second waiver form. Ramsey stated that the blood spatter in his house was present because he shot a dog in his home and then dragged the body outside. Police officers found the remains of an animal outside the home but did not believe that the blood evidence matched an animal being shot. At the beginning of the interview, Ramsey stated that Buggs was trying to help him figure out who had robbed his house. By the end of the interview, Ramsey admitted that he believed Buggs was involved in the robbery and that they had engaged in an argument with him about it. Ramsey stated in this interview that he hit Buggs with a hammer. Additionally, Detective Cummings testified:

> Q: Why did you ask Mr. Ramsey why he said the phrase 'body's whereabouts,' why did that stand out to you?
>
> A: That was the first time he did not refer to Mr. Buggs by his name. He referred to him as 'the body.' That generally to me

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

would indicate that the person is no longer with us and it's just a body.

Q: And at that point you still had not located Cadarion's body, right?

A: That's correct.

After the second interview, detectives went to speak with Ramsey's girlfriend, Cyrus, and she told them that Ramsey had been using his mother's truck on the night of the incident. The police got a warrant to search the vehicle and then Detective Cummings went to speak to Ramsey again. They obtained another *Miranda* wavier from Ramsey prior to the third interview. During the third interview, on March 4, 2020 at approximately 9:51 p.m., Ramsey revealed the location of Buggs' body, and police were able to locate his remains, 13 days after he had been killed.

An arrest warrant was issued for Ramsey, and Cpl. Nick Olinger transported Ramsey to the Ouachita Parish Correctional Center. During the car ride, Ramsey asked Cpl. Olinger about his charges and the location of his phone. Cpl. Olinger read Ramsey his charges from the probable cause affidavit and told him that the detectives had probably put his phone into evidence. Ramsey asked Cpl. Olinger if he could talk to the detectives so he could get numbers from the phone. Cpl. Olinger said he would check and asked Ramsey if he knew him, meaning the detective. Ramsey said that he did not, but then asked whether Cpl. Olinger was talking about the detective or "the dead guy." Cpl. Olinger clarified he was talking about the detective. Ramsey then confessed to Cpl. Olinger that he and Buggs were friends and had gotten into a fight. He admitted to rolling his body into a rug, placing it in his mom's car, and dumping it. Cpl. Olinger asked how he decided where to leave the body, and Ramsey responded he drove around until he found a

4

"good spot." Cpl. Olinger did not read Ramsey his *Miranda* rights before or during the car ride.

Two days later, Detective Cummings went to the correctional facility and interviewed Ramsey again. He again advised Ramsey of his *Miranda* rights prior to this interview, and Ramsey signed a new waiver of rights form. During this interview, Ramsey told Detective Cummings that he shot Buggs because Buggs said he was going to shoot him and he was afraid, for the first time raising any claims of self-defense or justification.

A jury trial was held on this matter in Monroe, Louisiana, on October 17-20, 2022. At trial, Detective Cummings testified about his investigation and all of his interactions with Ramsey. Officer Brian May also testified that he assisted with the crime scene. Ramsey's girlfriend, Cyrus, testified that she spent the night at Ramsey's house the night of the confrontation between Buggs and Ramsey. At one point, she heard two loud pops, and she called her mother to come pick her up. Ramsey told her to lock the door. When she left the house, she could see a bleach bucket with brown, dirty water, and a rug and blanket were missing from the home. When she was leaving the home, Ramsey told her that he got his mother's truck stuck at the levee.

Cpl. Matthew Gilliland, with the West Monroe Police Department, testified that he processed Ramsey's mother's truck. Cpl. Anthony Walker, who works for the crime scene investigation unit of the Monroe Police Department, testified about processing the crime scene in the alleyway where Buggs' body was discovered. Also testifying was Dr. Frank Peretti, a forensic pathologist, who testified that he performed the autopsy on Buggs, concluding the cause of death was a gunshot wound to the head.

Cpl. Olinger, with the West Monroe Police Department, testified regarding what was said during his car ride with Ramsey, as described above. After questioning by the State was complete and the witness was tendered, defense counsel requested that the jury be removed from the courtroom. Defense counsel then argued to the trial court that the testimony elicited from Cpl. Olinger was an interrogation that was not free and voluntary and moved for a mistrial. The trial court noted that defense counsel did not make a contemporaneous objection to the testimony, and the mistrial was denied.

When the jury returned and the trial resumed, Ramsey testified on his own behalf. Ramsey described for the jury the prior burglary of his home and stated that he did not call the police but did ask his friends about the robbery. He testified he considered Buggs a good friend. Despite that friendship, the two began fighting because Ramsey was angry that Buggs had not found the person who broke into his home. Ramsey testified that they were arguing, then he got in Buggs' face, and hit him. The two men began wrestling, and Ramsey threw him to the ground. Buggs began crawling toward the living room. Ramsey testified that Buggs was known to carry a gun and had a gun in his pocket while at Ramsey's home. Ramsey testified that he took the gun away from Buggs, and "he started like crawling like trying to run, get away from me towards the living room." Ramsey testified that when Buggs was crawling away from him, he "just started shooting."

Ramsey stated that there was also another gun in the living room, the direction Buggs was crawling, but admits that he did not know if Buggs was trying to get the gun. He testified, "I got scared and I just started shooting

6

it." Ramsey testified how he then wrapped up and loaded Buggs' body in his mother's car, and drove around for about 10 minutes. After finding a suitable alleyway, Ramsey testified he dumped the body and then returned home to begin cleaning up the scene. Ramsey testified that he did not call the police because he did not want to go to jail or for his stepson to see what he had done.

After deliberation, the jury unanimously found Ramsey guilty of second degree murder. He was sentenced to life in prison, without the possibility of probation, parole, or suspension of sentence, as mandated by Louisiana statute. This appeal followed.

## DISCUSSION

Ramsey asserts two assignments of error regarding his conviction for second degree murder, being the insufficiency of evidence and the failure to grant a mistrial.

**First Assignment of Error: The evidence was insufficient to uphold the conviction for second degree murder.**

In his first assignment of error, Ramsey argues that the evidence was insufficient to uphold his conviction for second degree murder. Ramsey contends that the evidence established that he acted in self-defense and was in fear for his life, which he argued at trial and which issue was presented to the jury for consideration. In the alternative, he argues that the evidence established that he committed the offense in sudden passion or heat of blood, warranting the responsive verdict of manslaughter.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

Relevant to this case, second degree murder is "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434. Specific intent to

8

kill may also be inferred from the extent and severity of the victim's injuries. *State v. Bull*, 53,470 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1175, *writ denied*, 20-00797 (La. 12/22/20), 307 So. 3d 1040.

La. R.S. 14:31(A)(1) states that manslaughter is:

A homicide which would be murder under ... Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

A defendant who claims provocation as a means of reducing murder to manslaughter bears the burden of proving these elements by a preponderance of the evidence. *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 316 So. 3d 1196, *writ denied*, 19-00761 (La. 11/19/19), 282 So. 3d 1066. Provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *Id.*, *citing State v. Leger*, 05-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1279, 167 L. Ed. 2d 100 (2007).

"Sudden passion" and "heat of blood," which distinguish manslaughter from homicide, are not elements of the offense, but mitigatory factors exhibiting a degree of culpability less than is present when the homicide is committed without them. *State v. Tompkins*, 403 So. 2d 644 (La. 1981); *State v. Arnold*, 30,282 (La. App. 2 Cir. 1/21/98), 706 So. 2d 578; *State v. Armstrong*, 32,279 (La. App. 2 Cir. 9/22/99), 743 So. 2d 284, *writ denied*, 99-3151 (La. 4/7/00), 759 So. 2d 92. A defendant who shows by a preponderance of the evidence that these mitigatory factors are present is entitled to the verdict of manslaughter. *State v. Lombard*, 486 So. 2d 106

(La. 1986). However, the defendant is not obligated to establish the factors affirmatively; instead, the jury may infer them from the overall evidence presented. *State v. Jackson*, 34,076 (La. App. 2 Cir. 12/6/00), 774 So. 2d 1046. The reviewing court's function is to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the state, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Lombard*, *supra*.

Provocative acts held to rise to the level of mitigating conduct involve physical threats or actions on the part of the victim. *State v. Heard*, 22-378 (La. App. 3 Cir. 11/23/22), 353 So. 3d 326, *writ denied*, 22-01829 (La. 4/18/23), 359 So. 3d 508. Mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter. *State v. Mitchell*, 39,202 (La. App. 2 Cir. 12/15/04), 889 So. 2d 1257, *writ denied*, 05-0132 (La. 4/29/05), 901 So. 2d 1063.

When a defendant raises self-defense as an issue, the burden is on the State to prove beyond a reasonable doubt that the homicide was not perpetrated in self-defense. In determining whether a defendant had a reasonable belief that the killing was necessary, factors that may be considered include the excitement and confusion of the situation, the possibility of using force short of killing, and the defendant's knowledge of the assailant's bad character. The question on a sufficiency of the evidence review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of others. *State v. Lensey*, 50,242 (La. App. 2 Cir. 11/18/15), 182 So. 3d 1059, *writ denied*, 15-2344 (La. 3/14/16), 189 So. 3d 1066.

We find there was sufficient evidence for the jury to convict Ramsey of second degree murder. The evidence is undisputed that Ramsey shot at Buggs four times, striking him twice in the back of the head, as Buggs crawled away from him. While he may have been crawling in the direction of the living room, where Ramsey asserts another gun was located, Ramsey admitted during cross-examination that he was not sure where Buggs was going or what he was going to do. While the two men had been arguing and wrestling prior to the shooting, the evidence revealed that Buggs, who was 5'2", was on the ground, unarmed, and attempting to get away from Ramsey, who is 6'1", when he was shot twice in the *back* of the head. Ramsey could not answer why he shot four rounds or why he continued to shoot at Buggs after Buggs had been hit with the first bullet. This and other evidence in the record, when viewed in the light most favorable to the prosecution, was sufficient for the jury to find beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of others.

Furthermore, any rational trier of fact could have found that the mitigating factors of "sudden passion" and "heat of blood" were not established by a preponderance of the evidence. While Ramsey testified that he and Buggs had an argument, that argument was based on Ramsey's anger that Buggs may have had something to do with the burglary at his home. Moreover, Ramsey's testimony reveals that he was the aggressor in the situation. He struck Buggs, who was almost a full foot shorter than him, knocking him to the ground. He took Buggs' gun from his pocket and then used the weapon to shoot Buggs twice in the back of the head as the much smaller man, already on the ground and facing away from him, attempted to

11

crawl away. This Court is not convinced that these were circumstances sufficient to deprive an ordinary person of their self-control or cool reflection such that Ramsey should have been convicted of manslaughter rather than second degree murder.

Considering the above, Ramsey's first assignment of error is without merit.

**Second Assignment of Error: The trial court erred in failing to declare a mistrial.**

In his second assignment of error, Ramsey argues that the trial court erred in failing to declare a mistrial after the testimony of Cpl. Olinger regarding his conversation with Ramsey. Ramsey argues that his confession to Cpl. Olinger during the car ride to the correctional center was a custodial interrogation and he should have been read his *Miranda* rights prior to speaking. Ramsey notes that the trial court only denied his motion for mistrial because his trial counsel did not timely object to Cpl. Olinger's testimony. He asserts that Cpl. Olinger's testimony before the jury was so prejudicial that the trial was unfair and resulted in a suspect verdict.

La. C. Cr. P. art. 775 provides that a mistrial may be ordered, and in a jury case, the jury dismissed, when "prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771."

In the case *sub justice*, the alleged inappropriate testimony came during the State's questioning of Cpl. Olinger. In pertinent part, Cpl. Olinger testified:

Q: Okay. Did he say anything else about what – why he – why anything happened between him and the victim?

A: Yes. He said that he began to suspect the victim of stealing some of his property, and he asked him about it. He told me the victim would never admit to it and began disrespecting him. He said a fight began. That he rolled the victim in a rug. Placed him in a vehicle and dumped his body in an alley.

Q: Okay. So, he told you there was a fight between himself and the victim?

A: Yes, ma'am.

Q: And then he went straight to talking about robbing -- rolling the victim in a rug?

A: Yes, ma'am.

Q: He did not say how the victim ended up in that rug?

A: No, ma'am.

Q: Okay. Was – did – did he say anything else after that?

A: So, after he gave that statement, I asked how he decided where to leave the body?

…

A: He said that he didn't know the area well, and that and I'll quote it again, he said, he drove around until he found a quote, good spot, end quote.

After this testimony, defense counsel requested that the jury be removed and asked for a mistrial because Cpl. Olinger's testimony described a non-Mirandized interrogation of Ramsey.

Before the state may introduce a confession into evidence, it must demonstrate that the statement was free and voluntary and not the product of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703 D; *State v. Ashley*, 44,655 (La. App. 2 Cir. 9/23/09), 22 So. 3d 1045, *writ denied*, 09-2305 (La. 4/23/10), 34 So. 3d 271; *State v. Freeman*, 45,127 (La. App. 2 Cir. 4/14/10), 34 So. 3d 541, *writ denied*, 10-1043 (La. 11/24/10), 50 So. 3d 827. If a statement is the product

13

of custodial interrogation, the State additionally must show that the person was advised before questioning of his rights under *Miranda v. Arizona*, *supra*. A trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless not supported by the evidence. *State v. Freeman*, *supra*. Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. *State v. Ashley*, *supra*.

Spontaneous and voluntary statements made while the defendant is in custody and not given as a result of police interrogation or compelling influence are admissible as evidence even when made without the *Miranda* warning. *State v. Caston*, 40,054 (La. App. 2 Cir. 9/28/05), 912 So. 2d 413. A trial court's determination on the credibility and weight of testimony relating to the voluntariness of a confession will not be overturned unless clearly contrary to the evidence. *Id*.

In the present matter, the trial court did not rule on the free and voluntary nature of Ramsey's confession to Cpl. Olinger. Instead, the trial court ruled that counsel's objection was not made contemporaneously and noted that had defense counsel objected at the beginning of Cpl. Olinger's testimony, he could have prevented the jury from hearing the testimony. For this reason, the court denied the motion for mistrial.

The determination as to whether a remark has resulted in denying a defendant a fair trial is within the sound discretion of the trial court, and a denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. *State v. Smith*, 418 So. 2d 515 (La. 1982); *State v. Bean*, 582 So. 2d 947 (La. App. 2 Cir. 1991), *writ denied*, 586 So.2d 567 (La. 1991); *State v. Matthews*, 552 So. 2d 590 (La. App. 2 Cir. 1989), *writ*

14

*denied*, 559 So. 2d 137 (La. 1990); *State v. Fielding*, 37,943 (La. App. 2 Cir. 12/10/03), 862 So. 2d 420, *writ denied*, 01-0249 (La. 12/14/05), 889 So. 2d 256.

Even if a mistrial was warranted under article 770, 771, or 775, the failure to grant a mistrial would not result in an automatic reversal of defendant's conviction, but would be a trial error subject to the harmless error analysis on appeal. *State v. Smith*, 43,136 (La. App. 2 Cir. 4/23/08), 981 So. 2d 200; State *v. Bradley*, 43,593 (La. App. 2 Cir. 10/29/08), 997 So. 2d 694, *writ denied*, 08-2997 (La. 9/18/09), 17 So. 3d 384, *cert. denied*, 559 U.S. 1068, 130 S. Ct. 2093, 176 L. Ed. 2d 723 (2010). Trial error is harmless where the verdict rendered is surely unattributable to the error. *Id.*

We find that the trial court's denial of the motion for mistrial was not in error. The record reflects the fact that Ramsey had been read and waived his *Miranda* rights three times before speaking to Cpl. Olinger. Ramsey was asking questions of Cpl. Olinger and any statements he made appear to be unsolicited statements against interest. Ramsey knew Cpl. Olinger was a police officer and willingly initiated and engaged in the conversation with him.

Moreover, the statements made by Ramsey when speaking to Cpl. Olinger were later confirmed by Ramsey himself, in his own testimony at trial before the jury. Ramsey himself testified that he and Buggs were friends, that "we had a little fight," and "I got in his face and then I hit him and then we was wrestling [sic]. I threw him to the ground." Ramsey also testified:

> Q: Okay. And did you in fact put Mr. Buggs in your mother's car?

A: Yes, sir.

Q: And what did you do after that?

A: I just remember – drove around for about ten minutes or so trying to find somewhere. That's it.

Q: So, you did in fact leave the body in Monroe?

A: Yes, sir.

Finally, Ramsey testified:

Q: Why did you put so many blankets on him?

A: I don't know.

We find no abuse of discretion or reversible error in refusing to declare a mistrial on the testimony of a police officer regarding the statements made by Ramsey that were later confirmed by Ramsey himself in his testimony before the jury. This assignment of error is without merit.

## ERROR PATENT

A review of the record reveals that the trial court failed to state that Ramsey's life sentence must be served at hard labor. The failure to include the requirement that the life imprisonment be served at hard labor is an illegally lenient sentence. An illegal sentence may be corrected at any time by the court that imposed the sentence of by an appellate court on review. La. C. Cr. art. 882(A). Further, the appellate court may notice sentencing errors as error patent. *State v. Williams*, 00-1725 (La. 11/28/01), 800 So. 2d 790. Because La. R.S. 14:30.1 is a mandatory felony, requiring any sentence to be served at hard labor, the error is harmless and self-correcting. *State v. Evans*, 51,811 (La. App. 2 Cir. 1/10/18), 245 So. 3d 1112, *writ denied*, 18-0281 (La. 11/20/18), 256 So. 3d 992.

## CONCLUSION

For the foregoing reasons, Lester Jay Ramsey, Jr.'s conviction is affirmed.

**AFFIRMED.**