Judgment rendered February 25, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,754-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

DAMION DARON SHERFIELD              Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 387,699

Honorable Donald Edgar Hathaway, Jr., Judge

* * * * *

LOUISIANA APPEALS                          Counsel for Appellant
& WRIT SERVICE
By: Remy V. Starns
    Holli Ann Herrle-Castillo
    Michael Anthony Mitchell

JAMES E. STEWART, SR.                      Counsel for Appellee
District Attorney

TOMMY J. JOHNSON
JASON WAYNE WALTMAN
CHRISTOPHER BOWMAN
Assistant District Attorneys

* * * * *

Before PITMAN, COX, and STEPHENS, JJ.

**COX, J.**

This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. Defendant, Damion Daron Sherfield ("Sherfield"), was convicted of second degree murder in violation of La. R.S. 14:30.1, for which he was sentenced to life without parole, probation, or suspension of sentence. For the reasons assigned, Sherfield's conviction is affirmed.

**FACTS**

Sherfield was indicted by a grand jury on May 26, 2022, for one count of second degree murder of Roderick Walker ("Walker"). Trial commenced on March 24, 2025, wherein the following pertinent evidence and testimony was presented:

Tarek Abuzeid ("Abuzeid") testified that he worked as a cashier at Village Foods, a neighborhood grocery store, along with Walker, who was asked to work as unofficial store security because people often stole items from the store. Abuzeid stated that he was familiar with Sherfield because Sherfield often went to the store. Abuzeid identified Sherfield in open court, explaining that he had known Sherfield since he (Sherfield) was a child. Abuzeid then testified that he and Walker were both working on February 15, 2022, when the shooting occurred. He explained that on the day of the shooting, Walker went to the back of the store to retrieve his jacket before leaving to pick his daughter up from school. At the same time Sherfield entered the store, Walker then made his way out of the store. Abuzeid stated that at some point, Sherfield left the store, and he continued working.

Abuzeid stated that he was checking out two customers when he heard two loud pops, which he realized were gunshots. Abuzeid explained that Walker came in the store holding his stomach, and stated, "T, I got hit."

Abuzeid stated that he did not know Walker had a gun until Walker fell on the floor and pulled the weapon out of his pocket and placed it on the floor. Abuzeid admitted that when the shooting occurred, he grabbed his own gun and he put Walker's gun in a file cabinet so no one else could take it.

The State then entered video surveillance from the store on the day of the shooting, and Abuzeid clarified that while the store had surveillance, the system did not have sound. In reviewing the surveillance footage, Abuzeid identified Sherfield as he entered the store and Walker as he left. Abuzeid noted that Walker's hands were in his pockets, and a gun could be seen in Sherfield's pocket. Abuzeid then identified the moment Sherfield left the store and noted that it appeared Sherfield seemed to speak with Walker. Abuzeid testified that during that time, he was inside the store and could not hear or see what happened outside.

In reviewing the exterior surveillance footage, Abuzeid explained that Sherfield could be seen leaving the store, pulling out a gun, coming back toward the store, and then raising the gun for approximately two seconds before firing at Walker. Abuzeid stated that Sherfield then fled and went into the parking lot of a church near the store. After reviewing the video, Abuzeid maintained that in the moments leading up to the shooting, he never heard yelling, arguments, or loud conversation, and that the day had been normal until that moment.

Officer Juliann Stralow ("Officer Stralow"), of the Shreveport Police Department ("SPD"), testified that she was dispatched to Village Foods on February 15, 2022, following a shooting. Officer Stralow testified that when she arrived, she saw the victim on the floor of the store with what appeared to be a gunshot wound in his stomach. Officer Dominic Claiborne ("Officer

Claiborne") testified that he was also dispatched to the scene and was informed that the suspect was a light-skinned black man wearing a blue jacket. Officer Claiborne stated he and other officers on the scene searched the surrounding area but were unable to find the suspect or a discarded firearm.

Corporal Shelia Taylor ("Cpl. Taylor"), a crime scene investigator for SPD, testified that she photographed the area and saw spent shell casings and one live round on the floor. She explained that a live round is a bullet that has been expended from a semi-automatic firearm after the slide on the gun was moved back. Cpl. Taylor then identified a photograph of a firearm recovered from a file cabinet in the store, noting that it was a .380 ACP Cobra Denali with a firearm magazine, which was placed there by the store employee.

Phillip Stout ("Stout"), an expert in the field of forensic firearms identification and examination, testified that as part of his examination, he performed test shots of the recovered .380 Cobra handgun and the 9 mm cartridge casings found at the scene. Stout determined that the handgun could not have fired the 9 mm cartridge casings, and that while he was not able to test the spent casings on another weapon, he determined that the casings were all fired from the same weapon.

Dr. James Traylor ("Dr. Traylor"), tendered as an expert witness in forensic pathology, testified that he performed Walker's autopsy. He determined that Walker's cause of death was a gunshot wound located on the left side of Walker's chest. Dr. Traylor testified that he also performed a toxicology report, which revealed Walker had methamphetamine and THC

in his system at the time of death, which he determined was likely ingested shorty before the shooting occurred.

Detective Jeremy Blanchard ("Det. Blanchard") testified that he assisted in questioning Sherfield after the shooting. Det. Blanchard stated that Sherfield turned himself in because he believed that Walker did not deserve to be shot. Det. Blanchard stated that the interview was recorded, and the video was played for the jury with the caveat that two portions of the video would be muted. Det. Blanchard explained that during the interview, Sherfield admitted that he shot Walker but expressed that he did not intend to kill him; his emotions just got the best of him.

Finally, Corporal Ashley Thrift ("Cpl. Thrift"), lead investigator, first identified Sherfield in open court. Cpl. Thrift then reviewed the store surveillance video, noting Sherfield could be seen entering the store with his hand on his pocket, as if clutching something. Cpl. Thrift then identified the moment in which Sherfield could be seen removing a gun from his right pocket and raising it for approximately two seconds before firing the gun three times, racking the slide of the gun back as he did.

Cpl. Thrift stated that once shot, Walker fell on the ground, got up, went inside the store, and ran down an aisle. She stated that at that time, nothing was seen in Walker's hand, and it was not likely that he would have had enough time to put a gun back in his pocket from the time he fell and got back up. However, she also admitted that Walker either spoke to or made a gesture at Sherfield and that Walker was later seen putting a gun down on the floor of the store. Cpl. Thrift stated that it did not appear that Walker acted aggressively toward Sherfield.

Cpl. Thrift stated that during Sherfield's interview, he stated he fired because Walker gave him a "mad dog look" and mumbled something under his breath, not that he saw Walker was armed. Cpl. Thrift stated that while Sherfield claimed that he only intended to shoot Walker in the leg, in her experience, to shoot someone in the chest, a person would have had to aim for that area of the body.

The State rested and Sherfield's counsel called Renita Sherfield ("Renita"), Sherfield's mother, to testify. Renita stated that on the day of the shooting, she had taken Sherfield to get a haircut at the barbershop located next to Village Foods. Renita stated that she waited in the car while Sherfield went inside the barbershop. She stated that during that time, she saw Walker continue to walk back and forth between the barbershop and Village Foods. She stated that at one point, Walker looked in her car, and because of his behavior, she asked Sherfield if he knew Walker.

Finally, Sherfield testified on his own behalf. Sherfield stated that on the day of the shooting he went to get a haircut, but because there was a long wait, he went to the store next door to talk with Abuzeid. He explained that while in the store, he noticed Walker looking at him, and Walker had his hand in his jacket pocket, which gave him the impression that Walker had a gun in his pocket. Sherfield stated he eventually asked Walker why he was watching him, to which Walker only mumbled something incoherent, and then stated, "I'll f*** you over." Sherfield stated he felt threatened by Walker's statement and the way he acted.

On cross-examination, Sherfield clarified that he thought Walker acted strangely because he was possibly on drugs but admitted he did not relay that information to officers. Sherfield also admitted that he did not see

a gun in Walker's hand but did see a bulge in Walker's jacket pocket that Walker appeared to grip. Sherfield reiterated that while he was not certain whether Walker had a gun on his person, he believed that Walker did because of the bulge in Walker's jacket pocket, and the way Walker appeared to be holding the object. Sherfield stated that when he fled the scene, his gun fell out of his pocket, and he went to an abandoned home where he put on clothes he found in the home. Sherfield stated he was scared but turned himself in because he wanted to make things right.

At the close of testimony, the jury found Sherfield guilty as charged. On March 31, 2025, defense counsel filed a motion for new trial and motion for post verdict judgment of acquittal, which were both denied. Sherfield was sentenced on April 9, 2025, to life imprisonment without benefit of parole, probation, or suspension of sentence. This appeal followed.

## DISCUSSION

On appeal, Sherfield presents one assignment of error for review: whether the State presented sufficient evidence for a jury to find him guilty of second degree murder rather than the responsive verdict of manslaughter.

Sherfield does not dispute that he shot Walker; rather, he argues that Walker not only behaved strangely moments before the shooting, which put Sherfield on alert, but that Walker had also threatened Sherfield, which led to the shooting. Sherfield notes that before the shooting, Walker had paced back and forth in front of the store and looked into Renita's vehicle, which concerned her. Sherfield further notes that Walker had stared at him while his hands were in his pockets, which led Sherfield to believe that Walker was on drugs and likely had a gun on his person. Sherfield argues that when

6

he approached, Walker mumbled something incoherent, and then threatened Sherfield by stating, "I'll f*** you over."

Sherfield maintains that Walker's erratic behavior, threatening statement, and body language, which indicated Walker had a weapon, collectively caused Sherfield to lose self-control and act within the heat of the moment. Given this, Sherfield argues that this Court should amend his conviction to manslaughter and vacate and remand his sentence.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Grimble*, 51,446 (La. App. 2 Cir. 7/5/17), 224 So. 3d 498.

This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Eason*, 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Alexander*, 51,918 (La. App. 2 Cir. 4/11/18), 247 So. 3d 981, *writ denied*, 18-0805 (La. 2/11/19), 263 So. 3d 436. The trier of fact is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part. The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *Id*.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Hampton*, 52,403 (La. App. 2 Cir. 11/14/18), 261 So. 3d 993, *writ denied*, 19-0287 (La. 4/29/19), 268 So. 3d 1029.

Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. *Hampton, supra*. Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. Circumstantial evidence provides proof of collateral facts and circumstances from which the existence of the main fact may be inferred

according to reason and common experience. *State v. Lilly*, 468 So. 2d 1154 (La. 1985); *Hampton, supra*.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1). La. R.S. 14:31(A)(1) states that manslaughter is:

> A homicide which would be murder under ... Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

A defendant who claims provocation as a means of reducing murder to manslaughter bears the burden of proving these elements by a preponderance of the evidence. *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 316 So. 3d 1196, *writ denied*, 19-00761 (La. 11/19/19), 282 So. 3d 1066. Provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *Id.*, *citing State v. Leger*, 05-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1279, 167 L. Ed. 2d 100 (2007).

"Sudden passion" and "heat of blood," which distinguish manslaughter from homicide, are not elements of the offense, but mitigatory factors exhibiting a degree of culpability less than is present when the homicide is committed without them. *State v. Tompkins*, 403 So. 2d 644 (La. 1981); *State v. Arnold*, 30,282 (La. App. 2 Cir. 1/21/98), 706 So. 2d 578; *State v. Armstrong*, 32,279 (La. App. 2 Cir. 9/22/99), 743 So. 2d 284, *writ denied*, 99-3151 (La. 4/7/00), 759 So. 2d 92. A defendant who shows by a preponderance of the evidence that these mitigatory factors are present

is entitled to the verdict of manslaughter. *State v. Lombard*, 486 So. 2d 106 (La. 1986). However, the defendant is not obligated to establish the factors affirmatively; instead, the jury may infer them from the overall evidence presented. *State v. Jackson*, 34,076 (La. App. 2 Cir. 12/6/00), 774 So. 2d 1046. The reviewing court's function is to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the state, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Lombard*, *supra*.

Provocative acts held to rise to the level of mitigating conduct involve physical threats or actions on the part of the victim. *State v. Heard*, 22-378 (La. App. 3 Cir. 11/23/22), 353 So. 3d 326, *writ denied*, 22-01829 (La. 4/18/23), 359 So. 3d 508. Mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter. *State v. Mitchell*, 39,202 (La. App. 2 Cir. 12/15/04), 889 So. 2d 1257, *writ denied*, 05-0132 (La. 4/29/05), 901 So. 2d 1063.

When a defendant raises self-defense as an issue, the burden is on the State to prove beyond a reasonable doubt that the homicide was not perpetrated in self-defense. La. C. Cr. P. art. 390. In determining whether a defendant had a reasonable belief that the killing was necessary, factors that may be considered include the excitement and confusion of the situation, the possibility of using force short of killing, and the defendant's knowledge of the assailant's bad character. The question on a sufficiency of the evidence review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense

10

of others. *State v. Lensey*, 50,242 (La. App. 2 Cir. 11/18/15), 182 So. 3d 1059, *writ denied*, 15-2344 (La. 3/14/16), 189 So. 3d 1066.

Sherfield argues that the totality of Walker's actions, i.e., giving Sherfield a "mad dog look," mumbling something incoherent, appearing to hold onto a concealed object in his pocket, and stating, "I'll f*** you up," was enough to deprive him of his self-control. However, the evidence in this case reflects that in the moments leading up to the shooting, Sherfield and Walker had not gotten into a physical fight or a verbal altercation. Instead, the store employee testified that until the shooting, everything was normal. Moreover, while Sherfield stated that Walker stated, "I'll f*** you up," he did not threaten to shoot Sherfield, and his words, as seen in the store's video surveillance, were not accompanied by threatening gestures, movements, or aggressive acts.

Instead, after Walker made this statement, Sherfield removed his own gun from his pocket, waited only two seconds, and fired three times at Walker before fleeing the scene. Sherfield asserts that he believed Walker was armed because of the bulge in Walker's jacket pocket. We note that Sherfield admitted that this was only a belief and that at no point did he ever see a gun on Walker's person. While the store's video surveillance revealed Walker did have a gun in his pocket, the video makes clear that at no point leading up to the shooting did Walker ever brandish the gun or remove it from his pocket. Cpl. Thrift also testified that during Sherfield's interview, he stated he fired because Walker gave him a "mad dog look" and mumbled something under his breath, not that he saw Walker was armed.

Given the totality of the evidence and testimony presented, we find that any rational trier of fact could have found that the mitigating factors of

11

"sudden passion" and "heat of blood" were not established by a preponderance of the evidence in this case. After a thorough review of the record, we are not convinced that Walker's actions and statements, without more, were sufficient to deprive an ordinary person of their self-control or cool reflection. Accordingly, we find that there was sufficient evidence for a jury to find Sherfield guilty of second degree murder, rather than the responsive verdict of manslaughter.

## CONCLUSION

For the forgoing reasons, Damon Sherfield's conviction is affirmed.

**AFFIRMED.**